**Loran W. ROBBINS, et al., as trustees of the Central States, Southeast and Southwest Areas Pension Fund, et al., Plaintiffs–Appellees.**

v.

**Lee LYNCH and Minnie Lynch, doing business as Lynch Truck Service, Defendants–Appellants.**

No. 87–1351.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 15, 1987.

Decided Jan. 6, 1988.

William M. Giffin, Pree & Pree, Springfield, Ill., for defendants-appellants.

Thomas C. Nyhan, Cent. States Law Dept., Chicago, Ill., for plaintiffs-appellees.

Before EASTERBROOK, MANION and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Lynch Truck Service signed the national master collective bargaining agreement with the Teamsters in 1975, when it entered the business. The agreement expired on April 1, 1976; Lynch executed on April 2 a promise to be bound by any agreement thereafter concluded by the multiemployer and multiunion bargaining associations. Once agreement was reached, Lynch adhered to its terms. That agreement expired April 1, 1979. Following its practice, Lynch sent the local union on March 29, 1979, a promise to adhere to the next national agreement:

> Want To Inform You We Are Willing To Pay What Ever The International And The Truckers Agree On For The New Contract Which Is Due 4–1–79. We Would Like To Contunie [sic] To Operate. If It Is O.K. With The Union And We Will Sign The New Contract. Please Send Us A Letter To That Effect.

The local did not reply, and Lynch never signed the agreement. But until the end of 1981, Lynch paid the wages called for by the 1979–82 agreement, made pension and welfare contributions per the agreement, negotiated and settled grievances under the terms of the agreement, and rendered to the local union the dues withheld from the pay of its members. On January 5, 1982, Lynch sent the local this letter:

> Pursuant to Article 39 of the National Master Freight Agreement and Article

63 of the Local Agreement which was [sic] previously entered into, please be advised that Lynch Truck Service desires to cancel and terminate the Agreement and you are hereby notified accordingly.

The health and welfare trust funded under the agreement kept Lynch's employees on the rolls through the end of March 1982; the pension trust credited Lynch's employees with work through the end of March. The trustees of these two funds filed this suit under ERISA, 29 U.S.C. §§ 1132(g)(2) and 1145, to recover the sums provided by the agreement and the damages authorized by statute for noncompliance. The funds initially requested roughly $10,000, but during discovery they learned that Lynch concealed the identities of some employees from the funds during 1979–82 and had paid nothing on their account. The funds ultimately received a judgment for more than $125,000.

Lynch's principal defense is that it never signed the 1979–82 agreement. So much is undisputed. It is also undisputed that Lynch promised in March 1979 to adhere to the agreement and gave signs of doing so. It paid the union scale, turned over dues under a checkoff system, negotiated grievances, and paid (some) pension and welfare contributions. It later invoked the termination clause of the agreement. Employers may adopt a collective bargaining agreement by a course of conduct. *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370 (7th Cir.1985); *Capitol–Husting Co. v. NLRB*, 671 F.2d 237, 243 (7th Cir. 1982). Lynch did so.

■ The district court granted summary judgment to the funds, and Lynch protests that this is improper because it denies intending to be bound by the agreement. This disputed issue of fact calls for a trial, Lynch insists. But only a "material" dispute staves off summary judgment, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986), and Lynch's undisclosed intent is not material. References in cases to the importance of "intent to be bound" are misleading if taken literally. As so frequently in law, "in-

tent" is a conclusion rather than a fact. A signatory to a contract is bound by its ordinary meaning even if he gave it an idiosyncratic one; private intent counts only if it is conveyed to the other party and shared. E.g., *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–15 (7th Cir.1987); E. Allan Farnsworth, *Contracts* 113–16 (1982). You can't escape contractual obligation by signing with your fingers crossed behind your back, even if that clearly shows your intent *not* to be bound. The parties are free to sign hortatory as well as binding documents; "intent" is important in the sense that if the parties agree on a hortatory instrument the court may not convert it into a different kind. See *Skycom.* This sense of "intent" denotes agreement between the parties and is not a license to allow undisclosed intent to dominate. Even statutes, widely said to follow the "intent of the legislature", draw meaning only from visible indicators such as their structure, the nature of the problem at hand, and public statements (as in committee reports). Private intent is irrelevant. See Oliver Wendell Holmes, *The Theory of Legal Interpretation,* 12 Harv. L.Rev. 417 (1899), reprinted in *Collected Legal Papers* 203 (1920). So it is here. Lynch may have had a private intent, but the signs visible to the union all pointed to Lynch's acceptance of the collective bargaining agreement. Lynch is bound by its terms.

■ Albert L. Lynch, Jr., the proprietor of Lynch Trucking Service during the years in question, filed an affidavit contending (1) that the union represented that Lynch had signed the master agreement; (2) that the union threatened to strike unless Lynch included "certain employees within the Union and Pension Fund Contracts"; and (3) that Lynch "would not have complied with the demands of the Union if they had been properly informed of the facts". The only "facts" to which this could refer are the absence of the signed agreement and the threat to strike. Neither is material. The local union's reference to a signed agreement must have come after March 29, 1979, probably substantially afterward (the affi-

davit does not supply a date). By then Lynch was bound, under the approach of *Gariup.* The threat to strike is unexceptional. Unions frequently decline to work unless the employer adheres to a collective bargaining agreement. The threat of "no agreement, no work" hardly makes adherence to the agreement involuntary, as Lynch supposes. This is the threat, express or implied, of every contractual negotiation. (E.g., "Unless you pay my price, I won't sell you my iron ore.")

The court should indulge all reasonable inferences in favor of the person opposing the motion for summary judgment, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), and one inference is that the union threatened to strike unless some ·but fewer than all employees were covered. (The affidavit refers to "certain employees".) Perhaps the local insisted that Lynch pay the union scale and pension contributions for drivers but not for office staff. This is how Lynch proceeded, making contributions on behalf of some employees but not others. We must decide whether such an exchange between the local union and Lynch is a "material" fact in a suit by the pension and welfare funds seeking to recover the contributions called for by the terms of the collective bargaining agreement.

■ A pension or welfare trust is a third-party beneficiary of the collective bargaining agreement. *Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir.1986). It receives the contributions (and makes the payments) negotiated by others. The actuarial calculations that produce the contribution and payout systems are based on the supposition that the funds will receive full contributions on behalf of all employees covered. If a local union and an employer try to shrink the duty to contribute without notice to the funds and a contraction of the funds' obligations, the fund may end up paying benefits without corresponding contributions. In the long run, the shortfall must be made up by lower benefits or higher contributions from other employers. The local union and employers may be tempted to take a free ride, because they have no interest in the welfare of employees and employers from other parts of the country. If the legal rule permits these under-the-table deals to defeat the pension and welfare funds' claim for contributions, there will be many more such deals—and some employers will contend that there have been such deals, whether there were or not. Pension and welfare trusts, representing the interests of other employees and employers, want to avoid both the costly litigation such claims entail and the inevitable shortfall in contributions.

■ Some courts, e.g., *Trustees v. Pump House, Inc.*, 821 F.2d 566 (11th Cir.1987), and *Rozay's Transfer*, 791 F.2d at 773–75, have held that a pension trust may enforce the contributions clause of a collective bargaining agreement over a defense of fraudulent inducement to sign. They conclude that pension funds, like holders in due course of commercial paper, are not subject to any defenses on the underlying instrument. We need not decide whether to follow that principle to its limit to conclude that pension and welfare trusts are not bound by undisclosed side agreements between employers and local unions.

Funds must assume that all participants in a plan are following the stated terms; no other approach permits accurate actuarial computations and proper decisions about which claims to pay. Just as the Federal Deposit Insurance Corp. is not bound by undisclosed promises of insured banks, *Langley v. FDIC*, —— U.S. ——, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), so pension funds get the benefit of the written terms of agreements. Section 1145 of ERISA requires employers to make all pension contributions "not inconsistent with law". This language was added to ERISA "to simplify delinquency collection" by freeing pension and welfare funds from defenses that pertain to the unions' conduct. Senate Committee on Labor & Human Resources, *S. 1076—The Multiemployer Pension Plan Amendments of 1980: Summary and Analysis of Consideration*, 96th Cong., 2d Sess. 43–44 (1980). A claim that the payment is itself unlawful may be entertained. *Kaiser Steel Corp. v. Mullins,*

**334**

455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). A claim that the union has promised not to collect a payment called for by the agreement is not a good answer to the trustees' suit—although it might be a ground on which to obtain damages from the local union. *Chicago Council of Carpenters v. Dombrowski*, 545 F.Supp. 325, 328 (N.D.Ill.1982).

Lynch did not implead the local union in this case. It also omitted to challenge the amount of damages sought by the funds, and the current defendants (Lee and Minnie Lynch) did not resist their substitution for Albert Lynch, the deceased former proprietor. Although there might be difficulties in the computation of damages, and although one might have supposed that the claims against a sole proprietorship should have been asserted against Albert Lynch's estate, none of these contentions has been preserved.

■ The only other subject we need address is Lynch's counterclaim seeking recovery of the payments it made to the funds during 1979–81. The district court dismissed this counterclaim for want of subject matter jurisdiction. This was an error; as a compulsory counterclaim under Fed.R.Civ.P. 13(a), it was within the court's ancillary jurisdiction. *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974); *American National Bank v. Bailey*, 750 F.2d 577, 583 (7th Cir.1984). The counterclaim fails on the merits, however. Given that the funds are entitled to the full contributions called for by the collective bargaining agreement, it follows that Lynch is not entitled to recoup sums already paid against this obligation. We need not decide whether recoupment would be possible if Lynch had no obligation to contribute anything, or what administrative steps might precede litigation.

We modify the judgment to dismiss on the merits Lynch's claim to recoup contributions paid. As so modified, the judgment is

AFFIRMED.