854 F.2d 1074
 129 L.R.R.M. (BNA) 2297, 111 Lab.Cas. P 11,090
 CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
a Pension Trust, and Central States, Southeast and Southwest
Areas Health and Welfare Fund, a Health and Welfare Trust,
Plaintiffs-Appellants,
v.
GERBER TRUCK SERVICE, INC., Defendant-Appellee.
 No. 87-2480.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 18, 1988.
Decided Aug. 25, 1988.
 
 Albert M. Madden, Central States Law Dept., Chicago, Ill., for plaintiffs-appellants.
 Ross A. Friedman, Susman Schermer Rimmel & Parter, St. Louis, Mo., for defendant-appellee.
 Before WOOD, Jr., CUDAHY and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 This appeal is brought by certain health and welfare and pension funds seeking to extend the liability of a trucking company for benefit contributions on behalf of its "bargaining unit" employees. Contributions had been made for only three drivers who were union members retained from a company purchased by the employer's owner, as a sole proprietor, prior to incorporation of his company. The benefit funds also seek to extend the employer's liability to include the period through March 31, 1985, based on the employer's 1984 written notice terminating the labor contract. The district court found the employer liable only for certain unpaid contributions in connection with the three drivers. In addition, it awarded the funds accrued interest and attorney's fees. The funds also appeal, however, the court's denial of liquidated damages and other penalties.
 
 I.
 
 2
 In 1981, James H. Gerber, a sole proprietor in the trucking business, bought the assets and the operating authority of Fat's Express Truck Service ("Fat's"), which had employed three truck drivers--William Strubbe, Fred Witkus and Timothy Roarty. Gerber retained all three, who had been members of Teamsters Local 50 ("Local 50"). Fat's had been a party to the 1979-1982 National Master Freight Agreement, which is the Teamsters' multiemployer collective bargaining agreement with certain truckers. This agreement entitled the three Fat's drivers, among other things, to employer-paid health and pension benefits administered by Central States, Southeast and Southwest Areas Health and Welfare Fund and Central States, Southeast and Southwest Areas Pension Fund, respectively (the "Funds").
 
 
 3
 When Gerber bought Fat's and retained its three drivers, he was already employing two drivers who were not working under a union contract. Gerber did not assume the labor contract between Local 50 and Fat's. Shortly after buying Fat's, however, Gerber contacted John Gonzales, business representative for Local 50. Gerber told Gonzales that he wished to continue providing the health and pension benefits for the three drivers who had come from Fat's. Gerber also told Gonzales that he intended to handle all other aspects of their employment, such as wages, hours and working conditions, by individual agreement. On February 4, 1981, Gerber executed the Teamsters' 1979-1982 National Master Freight Agreement and a Supplemental Agreement (collectively the "1979-1982 Agreement"). The 1979-1982 Agreement defined Gerber's bargaining unit as "all truckdrivers, helpers, dockmen, warehousemen, checkers, power-lift operators, hostlers, and such other employees as may be presently or hereafter represented by the Union," and required Gerber to pay contributions to the Funds on behalf of "covered" employees. Gerber and Gonzales contemporaneously signed a Participation Agreement, which specifically concerned only Gerber's obligation to the Funds with respect to the provision of benefits to employees. The Participation Agreement also required Gerber to pay contributions to the Funds on behalf of covered employees. This document, however, described covered employees as "DRIVERS represented by the Union," a narrower classification selected by Gerber and Gonzales to convey their mutual intent to include only the three former Fat's drivers.
 
 
 4
 Gerber did contribute to the Funds on behalf of the three Fat's drivers. As to all other terms of employment, however, Gerber reached individual agreements with all of his employees, including the Fat's three. Local 50 apparently approved of this arrangement. In its list of employees covered for purposes of Local 50 representation, it named only the Fat's three. It did not require Gerber's other employees to join the union or demand that Gerber discharge them. And it never represented the other employees for any purpose (nor the Fat's three for any purpose other than health and welfare and pension benefits). No grievances were ever filed, nor any arbitrations undertaken. The terms and conditions of the 1979-1982 Agreement were wholly inoperative from the start (except as to the Fat's three benefits already noted).
 
 
 5
 Both the 1979-1982 Agreement and the Participation Agreement had an expiration date of March 31, 1982. Article 39, Sections 1 and 2 of the 1979-1982 Agreement provided for modification or termination in compliance with Section 8(d)(1) of the Labor Management Relations Act of 1947 (the "LMRA"). 29 U.S.C. Sec. 158(d)(1). Both agreements specified that they would continue from year to year after their stated expiration date unless either party, at least sixty days before the expiration date, notified the other in writing of a desire to cancel or terminate. The Participation Agreement also required Gerber to notify the Funds in writing of his intent to stop contributing to the Funds.
 
 
 6
 In early June 1981, Gerber incorporated his business as Gerber Truck Service, Inc. ("Gerber Truck"). Gerber Truck assumed Gerber's obligations to continue providing fringe benefit coverage for the three former Fat's drivers. In September 1981, Local 50 sent Gerber Truck a written notice of its desire to revise or change the terms and conditions of the 1979-1982 Agreement. Gonzales, in July 1982, forwarded to Gerber Truck a copy of the new National Master Agreement effective in April 1982. After several telephone conversations, Gerber orally rejected the new contract on August 15, 1982, and refused to sign another contract. Local 50 ceased any attempt to negotiate with Gerber Truck.
 
 
 7
 Gerber continued to report the work history of the three Fat's drivers to the Funds. Except for intermittent periods of delinquency lasting approximately from mid-1981 through mid-1982, Gerber continued to pay the Funds the required contributions for those three drivers until two retired--Witkus in September 1983 and Strubbe in August 1984--and the third, Roarty, withdrew from the union in April 1984. Roarty, however, continued to work for Gerber Truck through October 1986. Considering his benefit obligations for the three Fat's drivers at an end, Gerber sent the Funds a letter on May 11, 1984, advising them that Roarty had withdrawn from the union and that Gerber Truck was canceling all obligations to the Funds effective April 29, 1984.
 
 
 8
 Upon auditing Gerber Truck and discovering that it employed more than the three drivers, the Funds opened health and pension benefit accounts for all of Gerber Truck's employees hired since February 4, 1981. The Funds sued Gerber Truck in July 1984 seeking benefit contributions for all of its employees--helpers and mechanics as well as drivers. After the Funds filed suit, Gerber Truck again notified the Funds, on November 5, 1984, that it was terminating any alleged obligations. On this date, Gerber Truck also notified Local 50 by letter that it was terminating the 1979-1982 and Participation Agreements.
 
 
 9
 The Funds based their complaint on section 515 of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1145, which provides that an employer remit contributions in accordance with the terms of the collective bargaining agreement.[1] The Funds expressed concern that Gerber Truck's other employees might seek pension or other benefits and that the Funds would not have set aside funds sufficient to honor those demands.[2]
 
 
 10
 The district court held that the 1979-1982 Agreement had been modified by an understanding reached between Gerber and Gonzales to have Gerber provide health and welfare and pension benefits solely to the Fat's three. In the court's view, the 1979-1982 Agreement and the Participation Agreement were executed only to ensure continued benefit coverage for the three Fat's employees. The district court also concluded that Gerber orally rejected a new agreement on August 15, 1982, resulting in the termination of the 1979-1982 Agreement on October 15, 1982. This termination, according to the district court, ended Gerber Truck's obligation to make payments to the Funds on behalf of the Fat's three. The court ordered Gerber Truck to pay to the Funds certain unpaid contributions together with accrued interest and attorney's fees. The court did not, however, assess liquidated damages or other penalties against Gerber Truck, because it found that a legitimate dispute existed with respect to Gerber Truck's benefit coverage liability.
 
 II.
 
 11
 On appeal, the Funds argue first that, contrary to the holding of the district court, the 1979-1982 Agreement could not be modified to limit coverage to three employees, because as a general rule collective bargaining agreements cannot be modified orally. Certainly, in the case of trust fund contributions, section 302(c)(5) of the LMRA requires that the union and the employer specify in writing the basis upon which the employer will make the contributions. 29 U.S.C. Sec. 186(c)(5)(B).[3] Courts have interpreted this statute to preclude oral modifications of written collective bargaining agreements involving payments to trust funds. See, e.g., Mo-Kan Teamsters Pension Fund v. Creason, 716 F.2d 772, 777 (10th Cir.1983), cert. denied, 464 U.S. 1045, 104 S.Ct. 716, 79 L.Ed.2d 178 (1984); Waggoner v. Dallaire, 649 F.2d 1362, 1366 (9th Cir.1981).
 
 
 12
 The Ninth Circuit, for example, has expressed the fear that giving effect to oral modifications would defeat the congressional intent to protect trust beneficiaries and might encourage oral side agreements between unions and employers that could erode the pension rights of unsuspecting workers. Id. In Waggoner, the president of the defendant employer had signed a collective bargaining agreement with a union local based upon the oral understanding that its trust benefit terms would not be enforced. The court of appeals refused to permit the oral modification because it "would defeat the elaborate protection section 302 provides trust beneficiaries." Id. The court continued:
 
 
 13
 Employees, basing their futures on the promise of any old-age pension provided in a union contract, may discover in later years to their surprise that an oral side-agreement had eroded the worth of their pension rights. The rule may also tempt local union representatives and employers to enter corrupt bargains since no written record would exist delineating the employer's trust obligations.
 
 
 14
 ....
 
 
 15
 ... [W]e feel that the LMRA prevents a local union agent and an employer from starting with an industry-wide plan as base, orally departing from it in respects that contravene its essence, and then forming a final agreement, absent a formal writing to that effect.
 
 
 16
 Id.
 
 
 17
 The concerns expressed by the Ninth Circuit in Waggoner are very important and the principles the court espouses must be zealously applied. Allowing oral modifications of collective bargaining agreements might invite collusive alterations of those agreements to the detriment of employee coverage under health and welfare and pension plans. In addition, the trust funds responsible for furnishing the benefits would be unable to rely on the written collective bargaining agreement as a basis for determining their obligations. See Robbins v. Lynch, 836 F.2d 330, 333 (7th Cir.1988).[4]
 
 
 18
 Thus, we agree with other circuits that, as a general matter, collective bargaining agreements may not be modified by oral agreements between employers and bargaining representatives. The Funds here apparently rely on the multiemployer collective bargaining agreement, read in conjunction with the trust agreements, the trust plans and the Participation Agreements,[5] to determine the extent of their coverage and of the employers' liability for benefit contributions. The Funds may have no way of discovering that a particular collective bargaining agreement was modified orally. Thus, such modifications should, as a rule, be denied effect. A strict application of this rule to the present case, however, might lead to an extremely inequitable outcome.
 
 
 19
 It is undisputed that Gonzales and Gerber subscribed to a writing that in form was a master multiemployer collective bargaining agreement. It is equally clear that neither party intended the document to have the force and effect of a collective bargaining agreement. Gonzales and Gerber both testified that they entered into a contract only to continue fringe benefits for three individual employees. We know of no principle which suggests that, under these circumstances, the employer and the union have, in contemplation of the law, entered into a "collective bargaining" agreement.[6] Because the union never represented Gerber's employees for any purpose "collectively," it is unlikely that they have any expectation of, or a legitimate basis for, receiving fringe benefits pursuant to the 1979-1982 Agreement. To exact from Gerber contributions for employees who are not entitled to them and, more importantly, who have never believed that they were entitled to them might result in a windfall to the Funds without any justification.
 
 
 20
 The parties' use of a master agreement as a device to continue fringe benefits for three individuals was ill-advised, certainly from the point of view of the Funds. Nonetheless, this case does not involve a union and an employer entering into a collective bargaining agreement and then diminishing their obligations and diluting employees' rights under that contract by subsequent oral agreement. Rather this is apparently a contract for the limited benefit of three individuals (protecting them from loss of pension and health benefits) memorialized on a form that under other circumstances would have had broader impact. As far as appears, no one has been misled to his detriment with respect to any terms or condition of employment.
 
 
 21
 The Funds, however, should not bear the onus of Gerber's apparent error in signing the 1979-1982 Agreement. Since this agreement on its face requires Gerber Truck to make contributions to the Funds on behalf of various categories of employees, Gerber Truck should have the burden of proving that none of its employees, other than the Fat's three, has a reasonable basis for believing that he was entitled to any benefits under the agreement. In addition, Gerber Truck must prove that no employee may bring a claim for benefits under the agreement against the Funds. We will therefore remand the case for the purpose of making this determination. We emphasize that the facts as we presently understand them are that (1) no employee other than the Fat's three has a colorable potential claim for benefits against the Funds and (2) no employee (other than the three) has a reasonable basis for believing that he or she had such a claim. If our assumptions are in fact correct, the rights and interests of the Funds and of Gerber Truck employees have not been jeopardized. However, nothing in the record, as it has developed thus far, specifically addresses these concerns, and the district court has made no findings with respect to them. We stress that these factors are relevant only because the employer and the union did not, in our view, enter into a "collective bargaining" agreement in the first instance. On remand, Gerber Truck must demonstrate that no employee (other than the Fat's three) has a colorable potential claim to benefits from the Funds and that no employee has ever had a reasonable basis for believing himself entitled to make such a claim. If Gerber Truck can satisfy this burden, it is not bound to make contributions (going beyond the Fat's three) in accordance with the written 1979-1982 Agreement, the Participation Agreement and all other relevant documents.
 
 III.
 
 22
 We turn to the question of when Gerber Truck's obligations to the Funds on behalf of its employees ended. The district court found Gerber Truck was obliged to make payments only until October 15, 1982, and held that it owed the Funds for delinquencies occurring prior to that date. According to the district court, the 1979-1982 Agreement, whose terms called for it to expire sixty days after notice of termination, was terminated effectively on October 15, 1982-sixty days after Gerber gave Gonzales his oral notice of termination. However, since both the 1979-1982 Agreement and the Participation Agreement expressly provided for year-to-year continuation unless terminated in writing, Gerber's August 1982 oral notice of termination was insufficient. Gerber's May 11, 1984 letter to the Funds canceling his obligations also was insufficient because it failed to cancel both the 1979-1982 Agreement and the Participation Agreement. Thus, Gerber Truck did not terminate its obligations until Gerber wrote letters to the Funds and to Local 50 on November 5, 1984. Gerber's November 1984 notice was not effective, however, until March 31, 1985, because both the 1979-1982 Agreement and the Participation Agreement continued in force from year to year after March 31, 1982. (They could terminate only on a March 31, provided Gerber gave sixty days written notice.) Therefore, since Gerber gave written notice in November 1984, Gerber Truck's obligations to the Funds extended through March 1985.
 
 
 23
 If Gerber Truck's obligations are limited to the three Fat's drivers, however, they may in fact have ended before March 31, 1985; Witkus and Strubbe retired and Roarty quit Local 50 before that date. We leave to the district court on remand the questions when Gerber Truck's payment obligations with respect to specific employees ceased and whether Gerber Truck was delinquent in making contributions during the period October 15, 1982, through March 31, 1985.
 
 IV.
 
 24
 The final issue in this appeal is whether Gerber Truck must pay liquidated damages or other penalties with respect to delinquent payments on behalf of its employees. The district court awarded the Funds attorney's fees and costs. But it did not order Gerber Truck to pay liquidated damages or other penalties because it found that there was a legitimate dispute and that penalties therefore were not owing. We disagree. Section 502(g)(2) of ERISA calls for the award of double interest or, alternatively, single interest plus liquidated damages (whichever is greater) whenever a fiduciary prevails in an action to enforce plan contributions under section 515 of ERISA, 29 U.S.C. Sec. 1145.[7] This Circuit has held that the provisions of section 502 are "mandatory in an action in which judgment in favor of the plan is awarded." Gilles v. Burton Constr. Co., 736 F.2d 1142, 1144 (7th Cir.1984). Moreover, requiring the payment of liquidated damages or double interest furthers the congressional policy of discouraging delinquency in payment of benefit contributions. See Central States, Southeast & Southwest Areas Pension Fund v. Alco Express Co., 522 F.Supp. 919, 925-28 (E.D.Mich.1981) (reviewing legislative history of section 502(g)(2) of ERISA). The district court found that Gerber Truck owes the Funds for unpaid contributions as to the Fat's three. On remand, it may find that Gerber Truck is liable for unpaid contributions with respect to other employees. Because the Funds have prevailed, at least in part, against Gerber Truck, the court must assess penalties as prescribed by section 502(g)(2).[8]
 
 V.
 
 25
 Therefore, we vacate the district court's order and remand with instructions to determine whether Gerber Truck is liable for any additional unpaid contributions, to calculate the interest on these unpaid contributions and to assess either double interest or single interest plus liquidated damages, whichever may be greater--all in accordance with this opinion.
 
 
 26
 The judgment is affirmed in part and vacated and remanded in part. Circuit Rule 36 shall apply. Each party shall bear its own costs.
 
 
 
 [1]
 Section 515 of ERISA provides:
 Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
 29 U.S.C. Sec. 1145.
 
 
 [2]
 Because the Funds are third-party beneficiaries of the collective bargaining agreement, they are not "parties" to the contract and, therefore, cannot apply directly to the National Labor Relations Board for relief but instead must seek relief in federal or state court under ERISA. See Laborers Health & Welfare Trust Fund v. Kaufman & Broad, Inc., 707 F.2d 412, 415 (9th Cir.1983)
 
 
 [3]
 Section 302, which places restrictions on financial transactions between a union and an employer, requires, among other things, that
 with respect to money or other things of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, ... the detailed basis on which such payments are to be made [must be] specified in a written agreement with the employer.
 29 U.S.C. Sec. 186(c)(5).
 
 
 [4]
 This court has recently explained in detail the reasons trust funds must be able to rely on the express terms of collective bargaining agreements:
 A pension or welfare trust is a third-party beneficiary of the collective bargaining agreement. It receives the contributions (and makes the payments) negotiated by others. The actuarial calculations that produce the contribution and payout systems are based on the supposition that the funds will receive full contributions on behalf of all employees covered. If a local union and an employer try to shrink the duty to contribute without notice to the funds and a contraction of the funds' obligations, the fund may end up paying benefits without corresponding contributions. In the long run, the shortfall must be made up by lower benefits or higher contributions from other employees. The local union and employers may be tempted to take a free ride, because they have no interest in the welfare of employees and employers from other parts of the country. If the legal rule permits these under-the-table deals to defeat the pension and welfare funds' claim for contributions, there will be many more such deals--and some employers will contend that there have been such deals, whether there were or not. Pension and welfare trusts, representing the interests of other employees and employers, want to avoid both the costly litigation such claims entail and the inevitable shortfall in contributions.
 Robbins v. Lynch, 836 F.2d 330, 333 (7th Cir.1988); see also Manning v. Wiscombe, 498 F.2d 1311, 1313 (10th Cir.1974).
 
 
 [5]
 Here the description of the "bargaining unit" in the Participation Agreement is apparently narrower than that contained in the contract with Local 50
 
 
 [6]
 The record does not suggest that anyone (except the Funds) gave credence to, or relied on, the agreement between Gerber Truck and Local 50 as a collective bargaining agreement. This is demonstrated by Gerber's unilateral institution, in November 1983, of an alternate health insurance plan for his non-union employees at their request--a fact which attests that they were not (and did not consider themselves) members of a unit for which Local 50 bargained collectively. According to Gonzales' undisputed testimony, Local 50, knowing that Gerber Truck had other employees, understood that the union had no representational role beyond securing specified benefits for three individuals. Thus, to label what the parties entered into a "collective bargaining" agreement does not accurately reflect the essence of their contract
 
 
 [7]
 Section 502(g)(2) provides for attorney's fees and costs in actions involving delinquent contributions:
 In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title [governing delinquent contributions] in which a judgment in favor of the plan is awarded, the court shall award the plan--
 (A) the unpaid contributions,
 (B) interest on the unpaid contributions,
 (C) an amount equal to the greater of--
 (i) interest on the unpaid contributions, or
 (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent ... of the amount determined by the court under subparagraph (A),
 (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
 (E) such other legal or equitable relief as the court deems appropriate.
 For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.
 29 U.S.C. Sec. 1132(g)(2).
 
 
 [8]
 The Participation Agreement itself contains provisions essentially the same as section 502(g)(2) of ERISA