CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and Howard McDougall, trustee

and

Central States, Southeast and Southwest Areas Health and Welfare Fund and Howard McDougall, trustee, Plaintiffs,

v.

TRANSPORT, INC., a Minnesota corporation, Defendant.

No. 96 C 2067.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 8, 1998.

Albert M. Madden, Margaret Mary Fahrenbach, Robert Anthony Coco, Patrick J. Connor, John J. Franczyk, Jr., Central States Law Department, Des Plaines, IL, for Plaintiffs.

Stephen David Merwise, Mark L. Schulman, Jenner & Block, Chicago, IL, David F. Loeffler, Krukowski & Costello, Milwaukee, WI, Barry A. Hartstein, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

Before this court is plaintiffs Central States, Southeast and Southwest Areas Pension Fund's, Central States, Southeast and Southwest Health and Welfare Fund's, and Fund trustee Howard McDougall's ("plaintiffs" or "funds") motion for summary judg-ment against defendant Transport, Inc. ("Transport" or "defendant") for past due contribution payments, interest, liquidated damages, attorney's fees, audit costs, and costs pursuant to 29 U.S.C. § 1132(g)(2).[1] For the reasons set forth below, plaintiffs' motion for summary judgment is GRANTED.

## I. Facts

### A. The Funds

The Funds are separate employee benefit plans and trusts. (Ptfs' 12(M) Stmt. ¶ 1.) Each of the Funds is primarily funded by contributions remitted by multiple participating employers pursuant to collective bargaining agreements ("CBA") negotiated with local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT") on behalf of employees of those same employers. (Ptfs' 12(M) Stmt. ¶¶ 2, 4.) All principal and income from the contributed monies are held and used for providing benefits (pension benefits by the Pension Fund and health and welfare benefits by the Health and Welfare Benefits) to the participants and beneficiaries of each Fund, as well as to pay for the administrative expenses of each Fund. (Ptfs' 12(M) Stmt. ¶ 3, 5.) Plaintiff McDougall is a Trustee and a fiduciary of each of the Funds as that term is defined under § 3(21)(A) of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1002(21)(A). (Ptf's 12(M) Stmt. ¶ 6.)

The Funds each have rules prohibiting the Funds from accepting CBAs which permit employers to contribute to the Funds for some, but not all, of the employees within a particular class of workers, i.e., for some truck drivers but not all of them. (Ptfs' 12(M) Stmt. ¶¶ 13, 15; Ptfs' Ex.F (Pension Fund's Special Bulletin 90–7); Ptfs' Ex.G (Health and Welfare Fund's Special Bulletin 77–19).)[2] When establishing the contribu-

---

1. The defendant had filed a summary judgment motion (Doc. 23–1) but subsequently withdrew its summary judgment motion in its reply brief (Doc. 51–1).

2. Transport disputes the Funds' characterization of these rules. The Funds state that the each rule "requires that participating employers contribute to the Pension Fund on behalf of all their employees working in the same job classification." (Ptfs' 12(M) Stmt. ¶¶ 13, 15.) The rules do, in fact, state, that the trustees of the Funds are required to reject any CBA which permits the employer to contribute different amounts of

tion rates necessary to support benefit levels, the Funds rely upon the cost estimates of actuaries. (Ptfs' 12(M) Stmt. ¶ 17.) In making their calculations, one of the assumptions that the actuaries make is that each employer will pay equal contributions for all employees with the same job classification. (Ptfs' 12(M) Stmt. ¶ 18.)[3] Another assumption that the actuaries make is that some participants who have contributions paid on their behalf will never receive any pension benefits or have less expensive health and welfare benefits than other participants. (Ptfs' 12(M) Stmt. ¶ 19.) In fact, the contributions paid for participants who either never receive benefits or receive fewer benefits from the Funds are necessary to support the level of benefits provided to other employees and, without contributions on all employees, including those less likely to receive benefits, the actuarial assumptions are unsound and there may not be sufficient assets to pay the promised benefits. (Ptfs' 12(M) ¶¶ 20–21.)

## B. The CBA between Transport and Union as received by the Funds (1992–95)

Transport is a Minnesota corporation and an "employer" and a "party-in-interest" as those terms are defined by §§ 3(5) and 3(14)(C) of ERISA, 29 U.S.C. §§ 1002(5) and 1002(14)(C). (Ptfs' 12(M) Stmt. ¶¶ 22–23.) Local Union No. 116 ("Union") of the IBT is a labor organization which represents for the purpose of collective bargaining, certain Transport employees; the Union has represented Transport employees at all times during the period from January 1, 1990 to the present, including employees who perform work as truck drivers. (Ptfs' 12(M) Stmt. ¶¶ 24–25.) From February 15, 1988, through February 29, 1992, Transport was bound by a CBA with the Union which was captioned "NORTH DAKOTA RIDER TO THE CENTRAL STATES AREA TANK TRUCK AGREEMENT" ("1988–92 Rider"); this is a rider to "Central States Area TANK TRUCK AGREEMENT—period covered— November 15, 1988 to November 14, 1991" ("1988–91 Agreement"). (Ptfs' 12(M) Stmt. ¶¶ 26–28.) On July 21, 1992, the Funds received a CBA signed by the Union and by Transport captioned "NORTH DAKOTA RIDER TO THE CENTRAL STATES AREA TANK TRUCK AGREEMENT FOR THE PERIOD March 1, 1992 to February 28, 1995" ("1992–92 Rider"); this is a rider to "CENTRAL STATES AREA TANK TRUCK AGREEMENT—Period Covered— November 15, 1991 to November 14, 1991" ("1991–94 Agreement"). (Ptfs' 12(M) Stmt. ¶¶ 29–31.)[4] On March 1, 1992, Transport and the Union entered into a Participation Agreement. (Ptfs' 12(M) Stmt. ¶¶ 32–33.)

These documents included certain obligations for Transport and the Union. Article 28 of the 1992–95 Rider received by the Funds and stated that "Contributions to the Health and Welfare Fund must be made for

money for employees within the same job classification, and one of the practices specifically noted as one that would be rejected is a CBA which by its terms or practical effect allows an employer to create a multiple-tier payment system based, like Transport's, on hiring dates. (Ptfs' Ex.F, G.) Thus, if the rules work, no participating employer can create such a multiple-tier payment system and, instead, must contribute equally for all employees working in the same job classification. Transport's dispute does not actually address the rules, but, instead, the effect of the "Extra Drivers Agreement," described below, which, as set forth in writing between the Union and Transport, allowed the creation of a two-tier contribution system. This is not a factual dispute, but a legal one as to the effect of the Extra Drivers Agreement on the overall agreement.

3. Transport disputes this statement on the grounds that the rule does not require every employer to pay for all employees with the same

job classification and that the Extra Drivers Agreement entered into between Transport and the Union relieved Transport of paying for certain drivers. But this does not dispute the factual statement that the actuaries assume contributions and participation by all of the employees within a given job classification.

4. Transport denies that the copy of the 1992–95 Rider enclosed as Plaintiffs' Ex.J is "true and accurate" because it does not include part of the CBA agreed to by the Union and Transport. (Dft's 12(N) Resp. ¶ 30.) However, it is important to note that the Funds do not claim that this was the entire CBA as conceived by Transport and the Union but, instead, that this was the CBA as received by the Funds. As a factual matter, there is no dispute that the Funds received the Rider without the "Extra Drivers Agreement." Thus, Transport has again addressed the legal effect of the fact, rather than attacking the fact itself.

each week on *each* regular or extra employee, even though such employee may work only part time under the provisions of this Contract, including weeks where work is performed for the Employer but not under the provisions of the Contract, and *although contributions may be made for those weeks into some other Health and Welfare Fund.*" (Ptf's Ex.J, Art. 28 (emphasis added).) Similarly, Article 29 of the 1992–95 Rider stated that "Effective March 1, 1992 the employer *shall contribute* to the Central States Southeast and Southwest Areas Pension Fund the sum of sixteen dollars and sixty cents, ($16.60) per day *for each employee covered by this agreement who has been on the payroll thirty (30) days or more.* The amount will be increased to seventeen dollars and forty cents ($17.40) per day effective March 1, 1993 and seven dollars and eighty cents ($17.80) per day effective March 1, 1994." (Ptf's Ex.J, Art. 29) (emphasis added); "Contributions to the Pension Fund must be made for each week on each regular or extra employee, even though such employee may work only part time under the provisions of this Contract, including weeks where work is performed for the Employer but not under the provisions of the Contract, and *although contributions may be made for those weeks into some other pension fund.*" The Participation Agreement signed by the Union and Transport states: "The Union and the Employer agree to be bound by, and hereby assent to, all of the terms of the Trust Agreement(s) creating said CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION AND/OR HEALTH AND WELFARE FUND, as amended, all of the rules and regulations heretofore adopted by the Trustees of said Trust Fund(s) pursuant to said Trust Agreement(s), and all of the actions of the Trustees in administering such Trust Fund[s] in accordance with the Trust Agreement(s) and rules adopted." (Ptf's Ex.L, ¶ 1.) Under the Trust Agreements which Transport and the Union agreed to follow, Transport is obligated to submit "each new or successive collective bargaining agreement, including not but limited to interim bargaining agreements and memoranda of understanding between the parties" to the Funds. (Ptf's Ex.C (Pension Fund Trust Agreement) & E (Health and Welfare Fund Trust Agreement), Art. III, § 1.) The Trust Agreements specifically state what the consequence of nondisclosure where an employer fails to submit such an agreement:

> Any agreement or understanding between the parties that in any way alters or affects the Employer's contribution obligation as set forth in the collective bargaining agreement shall be submitted promptly to the Fund in the same manner as the collective bargaining agreement; any such agreement that has not been disclosed to the Fund as required by this paragraph shall not be binding on the Trustees and shall not affect the terms of the collective bargaining agreement which alone shall be enforceable.

(Ptf's Ex.C (Pension Fund Trust Agreement) & E (Health and Welfare Fund Trust Agreement), Art. III, § 1.) The Participation Agreement also reiterates that the Employer shall contribute the funds required under the contract "for its bargaining unit Employees pursuant to the terms of the collective bargaining agreement, and only for such Employees" and states "If the Employer signs and enters into a new collective bargaining agreement with the Union, or modifies such current collective bargaining agreement, the Employer must notify the Trust Fund(s) of such contractual change, and further agrees that no applicable Statute of Limitations shall begin to run until such notice of contract change has been received by the Fund(s)." (Ptf's Ex.L, ¶¶ 5(a), (b), (c).) [5]

The Funds' Contract Department reviews each CBA received by the Funds to insure that they comply with the participation rules established by the Funds, including the rule identified in Special Bulletin 90–7 and 77–19,

---

**5.** Interestingly, the Participating Agreement which puts the burden on Transport to inform the Funds of any contractual changes in its CBA with the Union antedates the CBA at issue here, as the Participating Agreement is dated 3–1–92 and stamped received by the Funds on 5–26–92, while the 1992–95 Rider and the Extra Drivers Agreement were both dated 6–26–92, with the Rider being stamped received by the Funds on 7–21–92 and the Extra Drivers Agreement being stamped received on 4–17–95 (Ptfs' Ex.L, J, N.)

which requires that the Funds refuse any CBA which permits an employer to pay differing amounts of contributions for employees in the same job classification; if the Contracts Department detects a violation, the Department notes the violation and sends it to the Trustees' attention for a determination with respect to whether the employer will be allowed to continue to participate in the Funds. (Ptfs' 12(M) Stmt. ¶ 34.) Each incoming contract is reviewed by a Contracts Analyst, who completes a Contract Update Checklist form at the time of the review. (Ptfs' 12(M) Stmt. ¶ 35.) The 1992–95 Rider as received by the Funds was reviewed by a Contract Analyst, who completed a "Contract Update Checklist" on the contract. (Ptfs' 12(M) Stmt. ¶¶ 37–38.)

## C. The Extra Drivers Agreement

If the 1992–95 Rider as sent to the Funds was the entirety of the agreement made between the Union and Transport on June 26, 1992, there would be no dispute. However, unknown to the Funds until April 17, 1995, there was another agreement, "TRANSPORT INCORPORATED AND TEAMSTERS LOCAL 116 NORTH DAKOTA, MINNESOTA, EXTRA DRIVERS AGREEMENT" ("Extra Drivers Agreement"), signed on June 26, 1992. (Ptfs' 12(M) Stmt. ¶ 39.) Neither the Contract Update Checklist nor any other records of the Funds discloses the existence of the Extra Drivers Agreement, which was received by the Funds on April 17, 1995. (Ptfs' 12(M) Stmt. ¶¶ 40–41, 43.) Transport did not send the Extra Drivers Agreement to the Funds. (Ptfs' 12(M) Stmt. ¶ 42.)

Under the Extra Drivers Agreement, coverage for employees hired after November 15, 1991 was substituted with company sponsored health and welfare and 401K plans. (Ptfs' 12(M) Stmt. ¶ 41.) During the period of December 1989 through at least April 1995, Transport reported employee work history to the Funds, and the Funds billed Transport for contributions based upon the reported work history. (Ptfs' 12(M) Stmt. ¶¶ 44–45.) Each of the bills submitted by the Funds to Transport during this period contained the following "Certification Clause": "The Employer hereby reaffirms his obligation to make contributions required by the Collective Bargaining Agreement and further represents that all employees eligible to participate in the Fund, in accordance with the rules of the Fund and the 'Employee Retirement Income Security Act of 1974', are being reported and only those eligible employees are being reported." (Ptfs' 12(M) Stmt. ¶ 46.) In 1996, after receiving the Extra Drivers Agreement, the Funds audited Transport's records to verify the accuracy and completeness of employee work history reported to the funds by Transport for the period of December 29, 1991 through June 15, 1996 (i.e., to discover whether Transport was reporting all employees who meet the qualifications that trigger the required contributions); the audit revealed that Transport failed to report employee work history to the Funds and pay the corresponding contributions owed on employees described in the 1992–95 Rider. (Ptfs' 12(M) Stmt. ¶¶ 54–55.)[6]

Immediately after receipt of the Extra Drivers Agreement, the Funds notified the Union that the exclusion of new hires violated the Funds' rules and had to be deleted from the next contract. (Ptfs' 12(M) Stmt. ¶ 59.) The 1995–99 labor contract between the Union and Transport was subsequently received by the Funds, and it does not exclude new hires from participation in the Funds. (Ptfs' 12(M) Stmt. ¶ 60.)[7]

## D. Damages

The audit details the contributions owed by Transport to the Funds in the amounts of

---

**6.** Transport disputes that they "failed" to report any employees because they believe that the Extra Drivers Agreement's effect is that Transport is not obligated to contribute on behalf of those employees. (Dft's 12(N) Resp. ¶ 55.) This is a legal, not factual, dispute.

**7.** Transport disputes this claim on the grounds that there was an oral agreement between Transport and the Union to create a separate contract, but the Union breached that contract. (Dft's 12(M) Stmt. ¶ 60.) As discussed in this opinion, such an oral agreement between Transport and the Union has absolutely no effect on Transport's relationship with the Funds. Thus, this factual dispute is not relevant to the issues at hand.

$37,316.60 to the Pension Fund and $50,-332.00 to the Health and Welfare Fund. (Ptfs' 12(M) Stmt. ¶ 56.) The Funds have incurred $6,095.00 in audit costs in connection with the audit of Transport; Resolutions of the Boards of Trustees of the Funds require employers to pay audit costs if litigation is filed to collect additional billings that result from an audit. (Ptfs' 12(M) ¶ 57–58.)

## II. Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Cox v. Acme Health Serv., Inc.*, 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552–53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

## III. Discussion

This case presents a slight twist on the arguments offered time and again by employers seeking to justify why they should not be held liable for delinquent contributions to pension and health and welfare funds. The situation in these cases can be generally stated as follows: An employer and a union enter in a CBA. The CBA includes language whereby the employer agrees to pay certain amounts on employees to a pension fund and to a health and welfare fund. While the employer needs to provide pension and health and welfare benefits for its employees who are at high-risk of needing those benefits, it obviously would prefer to minimize its payments overall—and specifically on low-risk employees, for whom there is a low likelihood that they will receive benefits in any sizable amount. The union and the employer make an agreement that the employer will contribute either lower amounts or nothing to the funds for low-risk employees. The funds get no notice of this agreement and allow the employer to participate, thus guaranteeing to the employer's employees that they will receive the promised benefits. The funds, which cover a number of employers, determine how much to charge each employer on a per-employee basis by using actuarial analyses which assume that every employer is paying contributions on every employee within a given job classification. As a point of fact, the funds would not allow the employer to participate if the funds knew that the employer was not going to contribute to the funds on all employees in a given job classification because to do so would be unsound from an actuarial perspective—the employer inevitably chooses a means of selection, such as date of hiring, which weeds out the low-risk employees (whose contributions generally can be used to pay benefits on other, higher-risk employees), while keeping in the high-risk employees, whose benefits are likely to outweigh the contributions on their behalf. The employer, keeping to the agreement as it understands the agreement, contributes only on the high-risk employees until, at some point, the funds discovers that the employer is systematically failing to pay on all employees in a given job classification. The funds go through an expensive audit

process, confront the employer with the pattern of missing payments, and eventually have to go to court to try to get the missing contributions out of the employers.

The first wave of cases involved employers and unions who had entered into a CBA requiring contributions on behalf of all employees in a given job classifications but who had also made oral agreements that the CBA's contribution terms would be applied to permit the employer to exclude contributions on certain (lower-risk) employees. The Seventh Circuit emphatically holds that such oral agreements cannot alter the employer's obligation to contribute on behalf of all employees in a given job classification. *See Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1258 (7th Cir.1994) ("No matter what an employer and local union agree orally, the collective bargaining and contribution agreements establish the employer's obligation to the pension fund, which is not party to local understandings and limitations."); *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1154 (7th Cir.1989) ("If the employer simply points to a defect in [the CBA's] formation—such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law—it must still keep its promises to the pension plans."); *Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir.1988) ("[P]ension and welfare trusts are not bound by undisclosed side agreements between employers and local unions."). *Cf. Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co.*, 69 F.3d 1312, 1315 (7th Cir.1995) (stating that affidavit offered in Rule 60(b)(6) motion was irrelevant to the issue of whether an employer owed contributions to pension funds where affidavit purported to show that the drafters of the CBA at issue "had an objective or understanding at variance with the test"; stating that *Gerber* "precludes the use of extrinsic evidence that was unknown to a pension or welfare fund"). Subsequent cases similarly reject employer's defenses based on a number of different tactics: the employer's use of a false subsidiary in which it placed its

one high-risk employee, *Central States, Southeast and Southwest Areas Pension Fund v. Depew Development, Inc.*, 1997 WL 610318, *5 (N.D.Ill.1997), an oral agreement and subsequent written letter, undisclosed to the funds, sent from the union to the employer emphasizing that the intent of the parties was to cover only the one high-risk employee, *id.* at *3–4 and *4 n. 1, a "most-favored nations" clause in the employer's contract which allegedly would allow the employer to take advantage of an undisclosed written agreement between the union and a different employer, *Central States, Southeast and Southwest Areas Pension Fund v. Reebie*, 815 F.Supp. 1131, 1136 (N.D.Ill.1993), and undisclosed Letters of Understanding and Supplemental CBA executed by the employer and union to permit the employer to contribute to a 401(K) for a certain group of employees in lieu of payments to the Funds. *Central States, Southeast and Southwest Areas Pension Fund v. Tank Transport, Inc.*, 1993 WL 369331 (N.D.Ill.1993).

■ Transport, however, argues that its situation is different from all of these decided cases, which it terms "have its cake and eat it too" cases. (Dft's Reply Brief in Dft's Motion for Summary Judgment at 6.) Rather than signing a CBA agreeing to certain responsibilities and secretly agreeing to disavow those responsibilities, it allegedly signed one integrated agreement, which included not only the terms in the 1992–95 Rider but also the limitations of the Extra Drivers Agreement. Transport expected the union to send the entire agreement to the Funds, but the union representative, acting on his own initiative, did not send the Extra Drivers Agreement. Thus, in its view, Transport did not try, like these other employers, to misrepresent its promise or to make a promise to the funds with its fingers crossed, as it were. Even if this court completely accepts Transport's factual position, ignoring troubling facts such as Transport's discovery one-third of the way through the contract that the Extra Drivers Agreement had not been sent to the Funds, Transport's legal position still must be rejected. The § 515 line of cases is not premised on negligence or wrongdoing by the employer but, instead, on a number of

policies focused on preventing an employer from attaining participation in a multiemployer pension or health welfare fund on terms the employer could not have received had the agreement altering the fund's terms been disclosed.

The seminal case law applying § 515 line of cases clearly outlines the many reasons why Congress in enacting § 515 and the courts in applying § 515 have developed this strict rule allowing funds, like the plaintiffs, to rely on the documents that they receive from employers, to the exclusion of any other, undisclosed agreements. The Funds are defined-benefit plans, such that the Funds are obligated to pay out benefits to employees based on the terms of the participation agreement, regardless of whether their employer paid the requisite contributions. *Gerber Truck Service*, 870 F.2d at 1153. Where an employer fails to make the requisite contributions, the Funds are put at risk of having to pay benefits without receiving corresponding contributions, which ultimately would lead "lower benefits or higher contributions from other employers." *Robbins*, 836 F.2d at 333. This is exacerbated by two facts. First, the amount of the contributions required by the funds are determined by actuarial computations, which are premised on the assumption that all of the employer's employees in a given job classification are participating in the Funds. *Id.* Thus, where the Funds, in making their determinations, do not know that a number of employees are not participating, the actuarial computations, and the contribution requirements based on those computations, will be incorrect. *Id.* Second, acerbating this actuarial problem, is the fact that the Funds are insurance vehicles which "depend on receiving contributions from persons who collect far in the future or not at all." *Gerber Truck Service*, 870 F.2d at 1154. Thus, where an employer, like Transport, seeks to exclude low-risk employees from the Funds, it upsets the fundamental principles on which the Funds make its determinations: namely, that the contributions of low-risk employees can be used to offset the expensive benefits given to other, often higher-risk, employees.[8] Other effects that would occur if courts allowed undisclosed agreements between unions and employers to reduce employers' obligations to funds include higher investigatory costs for funds, higher litigation costs for funds, and "manifold opportunities for manipulation by crafty operators." *Gerber Truck Service*, 870 F.2d at 1154.

■ Every single one of these policies is present in the case of an undisclosed written agreement, even an undisclosed written agreement that was allegedly part of the "integrated" CBA. Transport would have this court hold that the Funds must be held to the terms of the entire agreement, even parts that the Funds never saw. Citing *Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co.*, it argues that all parts of the agreement must be given effect. 73 F.3d 727, 731 (7th Cir.1996). But *Kroger* says nothing about *undisclosed* agreements. Rather, the CBA at issue in *Kroger* involved a combined document, which expressly incorporated the supplement and which included only one signature block. *Id.* at 732. There were no facts in *Kroger* that indicated that the parties had failed to dis-

---

**8.** Another way of viewing this issue is this: the cost of coverage for a given employee is determined not by the anticipated benefits to that particular employee (i.e., is not individualized) but by the anticipated, average per-employee benefits (i.e., is generalized). An employer gets a offset rate on its higher-risk employees by virtue of the fact that the Fund receives contributions for lower-risk employees—because the employer is charged the same rate regardless of the risk level of the employee. A simple example illustrates. Assume that Fund X require $15 contributions per employee because the anticipated average benefits (ignoring administrative costs) per employee is $15. Employer Y has 10 employees, 5 of whom have an anticipated average benefit of $20 and 5 of whom have an anticipated average benefit of $10. If Employer Y pays $150 ($15 per employee) it covers its entire anticipated average benefit of $150, but if Employer Y successfully weeds out its low risk employees and only pays $75 ($15 per high risk employee), it will have contributed less money than its anticipated average benefit of $100 ($20 per high risk employee). This is a classic free rider problem and, as such, an employer, like Transport, who attempts to get the Funds' coverage for its higher-risk employees at the offset rate without getting the Funds' coverage for its lower-risk employees is truly trying to "have its cake and eat it too."

close the supplement to the Funds. *Id.* If the Funds had received the Rider *and* the Extra Drivers Agreement together, this court would have to consider both documents. *But see Bakery and Confectionery Union and Industry Intl. Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1024 (4th Cir.1997) (stating that *a clause included in the disclosed CBA agreement* will have no effect if it conflicts with the standard clause, by which the funds require "every employer to agree to make contributions at the specified rate, to be bound by the trust's terms and conditions, and not to enter into any additional agreements with the union regarding pensions"). As *Kroger* itself notes, citing *Gerber Truck Service*, "Section 515 gives pension funds, such as Central States, the right to 'enforce the writings according to its terms.'" 73 F.3d at 731. Thus, *"Gerber Truck Service* precludes the use of extrinsic evidence that was unknown to a pension or welfare fund." *Central Cartage*, 69 F.3d at 1315. The employer cannot attain a windfall by the fact of the union's [9] failure to send the Extra Drivers Agreement to the Funds, for the Funds would not have agreed to Transport's participation on the terms of the Extra Drivers Agreement if disclosed, and this court should not permit Transport "to do in secrecy what [it] could not do openly." *Gerber Truck Service*, 870 F.2d at 1155. The Funds are entitled to rely on the CBA that they receive; an employer should not rely on an agreement to reduce the employer's contributions unless the employer has insured that the Funds have received the agreement as part of or an amendment to the CBA. *See Tank Transport*, 1993 WL 369331 at *6–*7 (stating that where an agreement covering by its terms all employees within a certain job classification is disclosed to the Funds in requesting participation but an additional written agreement exempting some of those employees is not disclosed, the undisclosed

agreement is not given effect). This is eminently reasonable and puts the burden precisely where both Congress and the Trust agreements in this case intend for the burden to be: on the employer who is seeking distinctive terms.[10]

■ Finally, Transport is not relieved of its responsibility to pay contributions on all of its employees either by the fact that it paid money on some of the employees to alternate plans or because it has offered to waive benefits for those employees. *See Ex. J,* (1992–95 Rider) Art. 28, 29 (stating that payment into alternative funds does not relieve employer of responsibility to pay contributions to the Funds); *Central States, Southeast and Southwest Areas Pension Fund v. Schill Trucking Service, Inc.*, 1994 WL 87370, *4 (N.D.Ill.1994).

### IV. Conclusion

For the foregoing reasons, the Funds' motion for summary judgment is GRANTED. Transport is hereby ordered to pay the Funds all delinquent contributions that are owed from December 29, 1991 through April 17, 1995, plus the greater of either double interest or single interest plus liquidated damages, and all attorneys' fees, audit expenses and costs incurred by the Funds in connection with this action. The Funds shall submit by January 20, 1998, a Bill of Costs detailing the amount of delinquent contributions, the amount of interest owed on those contributions, the amount of liquidated damages owed on those contributions, and the amount of all attorneys' fees, audit expenses and costs incurred by the Funds in connection with this action. Transport may submit a response to that Bill of Costs by January 30, 1998. The only other pending motion,

---

9. The Funds point out that one of the documents that Transport signed was the Participation Agreement, which put the burden on Transport, not the union, to insure the Funds were given notice of any contractual changes. Thus, even if this court was inclined to consider the 1992–95 Rider and the Extra Drivers Agreement as "related" documents, this court would also have to consider the Participation Agreement with them, which could justify a finding that the Extra Driv-

ers Agreement has no legal effect under the Participation Agreement.

10. It is not necessary for the court to decide the effect of a provision that is at odds with standard provisions but is provided to the Funds in an inconspicuous manner, e.g., buried in the small print or located in such a way as not to draw attention.

Transport's motion for summary judgment, has been WITHDRAWN.