CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and Howard McDougall, Trustee, Plaintiffs,

v.

REEBIE STORAGE & MOVING CO., INC., Defendant and Third Party Plaintiff,

v.

LOCAL 705, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Third Party Defendant.

No. 91 C 202.

United States District Court, N.D. Illinois, E.D.

Feb. 25, 1993.

Margaret Fahrenbach, Rosemont, IL, for plaintiffs.

Edward B. Miller, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Central States, Southeast and Southwest Areas Pension Funds and Trustee Howard McDougall (collectively "Pension Fund," treated as a singular noun) has brought this ERISA action to collect assertedly unpaid employee benefit contributions from Reebie Storage & Moving Co., Inc. ("Reebie"). In

sharp contrast to the short life typically enjoyed (?) by such actions, this one has been agonizingly slow and is not yet even approaching the final disposition stage.[1] Most recently this Court has dispatched, as a legally nonviable claim, Reebie's effort to file a Third Party Complaint against Local 705 of the Furniture Chauffeurs, Piano Movers, Packers & Handlers Union, IBT ("Local 705"). This opinion deals with Reebie's motion for partial summary judgment against Pension Fund. For the reasons stated here, Reebie loses on that motion as well.

### Facts

Only a skeletal outline of the facts is required to focus the issues relevant to the current motion. Reebie's obligation to pay contributions for employees in its bargaining unit with Local 705 was created by each collective bargaining agreement ("cba") that those parties entered into (the one now at issue covered the years 1987–90) and by the corresponding Trust Agreements governing the Pension Fund. In each instance the cba was one negotiated by the Movers' Association of Greater Chicago ("Association"), both for its own member companies and for the use of individual employers (such as Reebie) who became parties signatory. Here are the key provisions of the cba and Trust Agreement for purposes of this motion:

*cba Art. 6:*

> Section A. Each Employer shall pay into The Central States, Southeast and Southwest Areas Pension Fund the payments hereinafter set forth and in the manner hereinafter set forth.

> The payments required hereunder shall be at the following rates:

> (a) January 15, 1987 through March 15, 1990—$55.00 per week plus additional contributions, if any, to be determined by the trustees of the Central States Southeast and Southwest Areas Pension Fund.

---

1. Reasons for that slowness will not be explored here, for that would create still another diversionary byway. But without necessarily ascribing fault to either party, this Court is constrained to observe that the resources that have obviously been expended here by Reebie would have been far better devoted to an early (and necessarily less costly overall) settlement. "Millions for defense but not one cent for tribute" may have an honored place in our country's early diplomatic history, but it is an absurd approach to litigation.

The above payments to be made on behalf of each employee who is paid the weekly guarantee in Article 4, Section E, but excluding "Summer Replacements" (Article 4, Section I). Effective as of February 9, 1981, a daily contribution equal to one-fifth (⅕) of the applicable weekly contribution shall also be made for each day worked, Monday through Friday, for each employee who is not paid the said weekly guarantee, up to a maximum of five days in any week.

Section B. Payments hereunder shall be made within fifteen (15) days following the end of each calendar month for each work week which has ended during the said calendar month. At the time of transmission of the aforesaid monthly payment, the Employer shall also transmit a list of the employees for whom contributions are being made and the amount of the contribution for each such employee. It is understood, however, that the making of a contribution for any employee does not guarantee his coverage under eligibility for or benefits under the governing Pension Plan, since such matters are governed solely by the terms of the Pension Plan itself.

The payment to the Pension Fund, as provided hereinabove and in the applicable trust agreement, shall not constitute or be deemed wages due the employee. It is understood and agreed that the sole liability of the Employer under this pension program shall be the payments of the contributions to the Pension Fund hereinabove set forth and as provided in Article 5, Section B.

The Association shall take such action on behalf of itself and the Employer as may be required under the terms of the governing Pension Trust Agreement and applicable laws in order to implement the terms of this Article. The Union shall submit to the Association the information on contributions to the Fund by Employers covered by this Agreement.

*cba Art. 2A, § B:* [2]

Section B. In the event that the Union enters into any separate contract which shall contain any provisions more favorable to the Employer than the corresponding provision of this Agreement then such provision shall automatically be substituted for the corresponding provision of this Agreement and become a part hereof. The Union shall supply the Association with a signed copy of any such contract which grants more favorable terms to the Employer involved within twenty-four (24) hours of its execution; and if any question arises as to whether the provisions of any separate agreement are more favorable to the Employer than the provisions of this Agreement, the Union shall supply the Association, upon request, with a signed copy of such separate contract.

*Trust Agreement Art. III, § 1:*

Any agreement or understanding between the parties that in any way alters or affects the Employer's contribution obligation as set forth in the collective bargaining agreement shall be submitted promptly to the Fund in the same manner as the collective bargaining agreement; any such agreement or understanding between the parties that has not been disclosed to the Fund as required by this paragraph shall not be binding on the Trustees and shall not affect the terms of the collective bargaining agreement which alone shall be enforceable.

Reebie and Local 705 executed and delivered the cba in August 1987—but because it really represented Reebie's signing on to an earlier Association-negotiated agreement, the cba was made effective retrospectively to January 15, 1987. Three months before Reebie and Local 705 signed up in that fashion, Local 705 had signed a letter agreement with Jackson Storage & Van Co. (the "Jackson Agreement"), setting out some arrangements applicable to Jackson that differed from the terms of the blanket agreement that had

---

**2.** This section will be referred to throughout this opinion, just as the parties have done in their briefing, as the "most favored nation" provision.

been negotiated by Association. In part the Jackson Agreement provided:

2. The Agreement [between Local 705 and Association] will apply to the four current seniority employees and any seniority employees added pursuant to paragraph 5 below. These employees shall receive the negotiated wage increases and contributions shall be made on their behalfs to the Health & Welfare and Pension Plans as set forth in the Agreement whenever they perform work in the classifications listed in Article 4 of the Agreement.

3. When seniority employees are offered fulltime work (40 hours per week) or are otherwise unavailable because of absence or lawful termination, Jackson may utilize independent contractors, subcontractors or nonunit employees to perform any and all work. Nothing in the Agreement shall apply to restrict or limit the utilization of such persons and, if employees are utilized, no part of the Agreement shall apply to them and they shall not be considered employees under the Agreement for any purpose.

4. Jackson agrees that on commercial moving work located in the loop area of the City of Chicago that it will: (a) give preference to experienced industry employees and members of Local 705; (b) request Local 705 to refer applicants pursuant to article 2, Section C before utilizing nonunit personnel, independent contractors or subcontractors to perform such moving work; (c) pay all helpers and chauffeurs working on such moves the then applicable hourly rate under Article 4; and (d) pay any contribution to the 705 Health and Welfare Fund that may be required by Article 5 for the hours worked on such moves.

5. An employee who works for Jackson on a fulltime basis performing commercial moving work (other than at nights and weekends) for six continuous months or for a total of twelve months in an eighteen month period shall be considered a seniority employee. An employee will be considered fulltime only in those months in which he or she actually works at least 140 hours on commercial moving work. Hours worked on household moving shall not be counted to determine fulltime status.

As its final substantive provision, the Jackson Agreement bound both Local 705 and Jackson to keep its terms confidential and not to disclose them to other moving companies or employers. Thus Local 705 did not tell Reebie about the Jackson Agreement either before Reebie and Local 705 signed up in August 1987 or at any time thereafter before Pension Fund brought this lawsuit.

### Applicability of Most–Favored–Nation Prohibition

When Reebie had earlier sought to inject Local 705 into this action as a third party defendant, this Court required that Reebie had to pursue the arbitration remedy prescribed in the cba. Reebie did that—and it won a ruling that the Jackson Agreement did indeed qualify as a most-favored-nation agreement that would, by virtue of cba Art. 2A § B, also become part of the contractual relationship between Reebie and Local 705. But Pension Fund was not a party to that arbitration, and this Court is therefore called on to decide the issue as between Reebie and Pension Fund.

Of course the decision of an arbitrator is entitled to respect even though it may not be binding on a court. But in substantial part the arbitrator here drew on non-documentary evidence for his decision— past practice, oral discussions and the like— while the established ERISA case law in this Circuit has firmly rejected the application against a pension fund of any oral agreements that limit employer contributions in a way inconsistent with the terms of the cba or the pension fund document itself (*Central States Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1151–56 (7th Cir.1989); *Robbins v. Lynch*, 836 F.2d 330, 333–34 (7th Cir.1988); *accord*, such cases elsewhere as *Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 775–76 (9th Cir.1986)). Hence this Court must look *only* at the Jackson Agreement coupled with the cba as grist for its mill on the most-favored-nation issue.

■ Whenever parties enter into an agreement with a most-favored-nation clause, the normal reading of that understanding is to look only to the possibility of a *future* racheting upward in favor of the clause's beneficiary, essentially in these terms:

> Here's our current deal. But if I give somebody else a better deal at any point during the life of our contract, I promise to give you the benefit of that better deal too.

But there is no basis for treating a *prior* understanding with some other party as triggering the most-favored-nation clause—at most the contracting party (the putative beneficiary) might complain that the other side should have disclosed the third-party arrangement up front, to enable the putative party to strike a better deal from the outset.

■ Nor does the fact that the Reebie–Local 705 cba, when it was ultimately agreed to, had an earlier effective date change the analysis. It remains true that the date on which parties *enter into* an agreement establishes their rights and obligations. So putting aside the question—which is not now before this Court—of whether Reebie might perhaps have any remedies against Local 705 (on some basis other than that dealt with in this Court's recent ruling dismissing Reebie's Third Party Complaint in this case), this Court is not persuaded that Reebie can claim the Jackson Agreement as a most-favored-nation provision that could affect *Pension Fund's* rights.[3]

■ But quite apart from Reebie's difficulties on that score, it cannot carry the day here. Here is how it seeks to put the onus on Pension Fund, attempting to rely on the fact that Pension Fund did not affirmatively inquire of Local 705 and Reebie about the existence of any most-favored-nation element affecting *other* employers:

1. Reebie's Mem. 7 and 13–14 says:

Plaintiffs admit having a true copy of the 1987–90 collective bargaining agreement between Reebie and Local 705. Although that contract contained the very clear most favored nations clause in its Article 2A, Section B, Plaintiffs have admitted that they at no time inquired of either Local 705 or of Reebie whether 705 had entered into any separate contract containing any provisions more favorable to Reebie than the corresponding provisions of the 1987 agreement, particularly provisions which required pension contributions on less than all of the Employer's bargaining unit employees.

*   *   *   *   *   *

When Central States was presented with a collective bargaining agreement containing a favored nations clause, it was not asking too much of Central States to require that it ask the parties whether any such separate agreement had been entered into which, when substituted in the collective bargaining agreement in issue, would restrict the scope of the agreement and thus the scope of pension liability in a manner different from the original clauses in the contract.

2. Relatedly, Reebie's R. Mem. 3–4 says this:

Central States had possession of a copy of the Reebie Agreement and were thus on notice that it contained a favored nations clause, thereby being put on notice that there were or could be limitations on Reebie's obligations under that agreement. Just as is true of a holder in due course under the Uniform Commercial Code, one with notice of such limitations may be a holder in due course, but he is subject to those limitations. A person is deemed to have such notice under the Commercial Code, and we respectfully suggest here, when "from all the facts and circumstances known to him at the time in question he had reason to know" of a defense against its future claims made under the contract or instrument. Central States admits that even though it had notice of the favored nations clause and, prior to the institution of this action, it had actual notice of the

---

3. Parenthetically, Reebie has not established that the Jackson Agreement was enforceable even against Jackson's employees (see *Merk v. Jewel Food Stores,* 945 F.2d 889, 895–96 (7th Cir. 1991)). If that is at all problematic, *Merk* would

certainly cast major doubt (on an a fortiori basis) on any potential enforceability against *Reebie's* employees of any most-favored-nation application based on the Jackson Agreement.

Jackson Agreement, it never at any time inquired whether any more favorable contract had been entered into by Local 705 and was thus automatically incorporated into the Agreement.

That kind of contention, which seeks to put the monkey on Pension Fund's back, is wholly at odds with common sense. It would put the trustees of an ERISA plan into the impossible position of having to put questions out continuously (daily? weekly? monthly? or what?) to every participating employer in a multi-employer plan (many of which cover hundreds of employers) to find out whether some side agreement has been entered into that would affect the contribution obligations of other participating employers.[4] And even more importantly for present purposes, Reebie's argument is directly at war with the approach that the multi-employer plan at issue in this case has taken to the most-favored-nation problem: Under the plan, the burden of inquiry and identification of any such changes is placed squarely on the employer (in this instance Reebie) and *not* on Pension Fund (see the language quoted earlier from Pension Fund Art. III, § 1).

Although *Gerber Truck* dealt with an undisclosed oral agreement between the union and employer, rather than with an undisclosed written agreement between the union and a different employer that might be incorporated by reference on most-favored-nation grounds, much of what was said there plainly points to reaching the same result here. This opinion will simply refer to, rather than quoting at length, Judge Easterbrook's discussion for the Court of Appeals in *Gerber Truck:* from the entire right-hand column of 870 F.2d at 1151 to the middle of the left-hand column at *id.* 1152 (interestingly enough, the court there identified as being barred by ERISA § 1145 an employer's claim "that the local union induced its signature by fraud" as well as a "dozen other lines

of defense"), all of the right-hand column of *id.* at 1153 and all of *id.* at 1155 (the court there pointed out in both places why it is essential to enforce the employer's promise to the pension plan, and it imposed that obligation on the employer even though "the upshot may be harsh" (*id.* at 1155)).

In summary, the approach taken in *Gerber Truck* teaches that as between Reebie and Pension Fund, the risk of nondisclosure of any limitations found outside of the cba document itself must rest on the employer and not on the employee benefits plan. And the fact that such nondisclosure may have resulted as a byproduct of fraud on the part of the union makes no difference.

*Conclusion*

Usually the result of a summary judgment motion is either to grant it (if there are no genuine issues of material fact, and if the movant is entitled to a judgment as a matter of law) or to deny it (if the existence of material factual issues prevents a dispositive legal ruling). In this instance Reebie's motion has disclosed that it must fail in *legal* terms.[5] At this point Reebie must therefore be considered liable for full Pension Fund contributions in accordance with the cba's original terms. In light of the need for further discovery on that score, this Court sets the next status hearing for 9 a.m. March 17, 1993, at which point the parties should come prepared to discuss the swift disposition of this case.

---

4. One other demonstration of the untenability of Reebie's position is that no one in the posture of Pension Fund's trustees could readily tell just by looking at a document such as the Jackson Agreement that it represented a most-favored-nation provision as to Reebie. Only Reebie itself, knowing its own personnel and how the approach taken in the Jackson Agreement would affect them, could do that.

5. It is more than odd for a litigant to tender the kinds of arguments that Reebie does in part—moving for a summary judgment and then arguing nonetheless that if its legal position is wrong, there are disputed factual issues that require resolution.