Thomas MORIARTY, etc., Plaintiff,

v.

GLUECKERT FUNERAL HOME,
LTD., Defendant.

No. 95 C 2848.

United States District Court,
N.D. Illinois,
Eastern Division.

May 23, 1996.

Karen I. Engelhardt of Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for Plaintiff.

Thomas K. McQueen and Kenneth R. Dolin of Jenner & Block, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Trustee Thomas J. Moriarty ("Moriarty"), on behalf of the Trustees of Local Union No. 727 I.B.T. Pension Trust and the Trustees of Teamsters Local Union No. 727 Health and Welfare Trust (collectively "Funds"), has sued Glueckert Funeral Home, Ltd. ("Gluec-

kert") under Labor Management Relations Act ("LMRA") § 301 (29 U.S.C. § 185) and Employee Retirement Income Security Act ("ERISA") § 502(a)(3) (29 U.S.C. § 1132(a)(3))[1] to collect delinquent employer contributions allegedly owed by Glueckert to Funds. Both sides have filed summary judgment motions under Fed.R.Civ.P. ("Rule") 56, with Moriarty seeking partial summary judgment only as to liability (and not as to damages) and with Glueckert asking for a total victory as a matter of law.

At this point the cross-motions are fully briefed, with both sides having complied with this District Court's General Rule ("GR") 12(M) and 12(N) (rules designed to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes).[2] For the reasons stated in this memorandum opinion and order, both motions are denied.

## Summary Judgment Standards

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the non-moving party (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions are involved, it is necessary to adopt "a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions" (*Camelot Care Ctrs., Inc. v. Planters Lifesavers Co.*, 836 F.Supp. 545, 545 (N.D.Ill.1993)).

As the later discussion shows, in this instance that dual perspective does indeed give rise to material issues of fact, precluding summary judgment in either direction. What follows in the *Background* section is limited to an undisputed version of events, while other facts that fit better into the substantive legal discussion will be included later in this opinion.

## Background

In 1970 John Glueckert, Sr. ("John Sr.") purchased an already established funeral home, which he has incorporated as Glueckert Funeral Home, Ltd. (P. 12(N) ¶ 1). By 1988 John Sr. was considering becoming a member of an association of like businesses because (among other reasons) he wanted to remain current in developments in the funeral home industry and to keep apprised of governmental regulations affecting the industry. One of the associations he considered was the Funeral Directors Services Association ("FDSA"), a multi-employer association comprising some 250 members (P. 12(N) ¶¶ 3–4).

On July 8, 1988 John Sr. received a letter from then FDSA Executive Director Moriarty outlining the services that FDSA provided to its members (P. 12(N) ¶ 13). And in late 1988 or early 1989 Moriarty met with John Sr. and Glueckert manager John Glueckert, Jr. ("John Jr.") to discuss Glueckert's potential FDSA membership (P. 12(N) ¶¶ 15–16). John Sr. then filled out a membership application in which Glueckert agreed to be bound by FDSA's Constitution, By–Laws and Rules and Regulations (P. 12(N) ¶¶ 19–20; P.Ex. N). On March 21, 1989 Moriarty sent John Sr. a letter advising that Glueckert's application had been accepted (P.Ex.O). John Sr.

---

**1.** Citations to both statutes will take the form "Section —," employing their Title 29 numbering rather than their internal numbering within LMRA and ERISA.

**2.** GR 12(M) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each fact. Then GR 12(N) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. In a cross-motion situation such as this, each side submits both a GR 12(M) and a GR 12(N) statement. Moriarty's initial statement will be cited "P. 12(M) ¶ —," and his responses and statement of supplemental facts will respectively be cited "P. 12(N) ¶ —" and "P. 12(N) Supp. ¶ —." Glueckert's submissions will be cited in the same fashion (prefaced by "D." rather than "P.").

then filled out an FDSA membership record card (P. 12(N) ¶ 22; P.Ex.N).

FDSA furnishes a wide variety of services to its members. Those include its running continuing education programs, providing updates as to developments in rules and regulations affecting the funeral home industry and negotiating collective bargaining agreements with the Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, I.B.T. ("Union") on behalf of FDSA's employer-members (P. 12(N) ¶¶ 4–11; D. 12(N) ¶ 7).[3]

Funds are employee benefit plans within the meaning of ERISA (Section 1002(3)) and are third-party beneficiaries of a series of collective bargaining agreements ("CBAs") entered into between FDSA and Union (D. 12(N) ¶¶ 2, 7–9). Moriarty is a Trustee and fiduciary of Funds, and between 1967 and 1994 he negotiated such CBAs on behalf of FDSA (D.12(N) ¶¶ 5, 10).[4]

Before and since Glueckert became an FDSA member there have been (and still are) in force a series of such CBAs between FDSA and Union (D. 12(N) ¶ 9). Those agreements, which are stated to be entered into by FDSA on behalf of all of its employer/members, provide that each member is obligated to contribute to Funds if it employs employees who perform certain covered job classifications—such as embalmers, funeral directors and auto livery chauffeurs (D. 12(N) ¶¶ 10.1–.3, 13, 19).

Glueckert has in fact employed individuals who perform embalming, funeral directing and auto livery chauffeur services (D. 12(N) ¶ 23, 25), but it has never notified Funds that it employed such individuals and has never made any contributions to Funds during its FDSA membership (D. 12(N) ¶¶ 14, 17, 28). And Funds has never made any request for contributions, nor until September 1994 did it affirmatively inform Glueckert that it may be obligated to pay them. At that time Funds made a demand for payment (P. 12(N) ¶¶ 47–49, 51–52; John Sr. Aff. ¶ 41). After learning that FDSA thus wished to bind it to the results of the CBAs, Glueckert resigned from FDSA (P. 12(N) ¶ 55).

*Legal Standards*

Before this opinion sets out the relevant law governing this dispute in detail, it must first clear away some cobwebs by dealing with an issue to which Moriarty devotes large portions of his memoranda. Only then can the discussion turn to the truly dispositive issue: whether FDSA had authority (either actual or apparent) to bind Glueckert to CBAs with Union so that Glueckert is obligated to Funds, the third-party beneficiaries of those agreements.

Moriarty Mem. 11 seeks to call to his aid Section 1145[5] and cases interpreting that section (most notably *Central States, S.E. and S.W. Areas Pension Fund ["Central States Fund"] v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1149 (7th Cir.1989) (en banc)[6] and *Robbins v. Lynch*, 836 F.2d 330 (7th Cir.1988)) to mean that a "pension or welfare fund is like the holder in due course in commercial law ... entitled to enforce the writing without regard to understandings or defenses applicable to the original parties"

---

3. But the scope of FDSA's participation in collective bargaining and labor negotiations is in dispute (see P. 12(N) ¶¶ 11–12)—more on that subject later.

4. LMRA requires that pension or health and welfare plans such as Funds must be jointly administered by representatives of labor and management. Moriarty owes his Funds Trustee's hat to his status as a management representative (his Aff. ¶ 2).

5. That provision reads:
   Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

6. Because employee benefit funds are such frequent ERISA plaintiffs, the most effective way to identify cases that are cited more than once in this opinion is by referring to the employer defendants rather than to the plaintiff funds. This opinion will follow that practice.

(*Gerber Truck,* 870 F.2d at 1149) and also that (*id.* at 1153):

> If the employer simply points to a defect in its formation—such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law—it must still keep its promise to the pension plans.

From those premises Moriarty R.Mem. 14 urges that Glueckert is foreclosed from arguing that FDSA had no authority to bind it to the FDSA–Union CBAs.

But that contention is fundamentally misguided, because for Section 1145 to come into play there must at least be some basis for binding the employer to the CBA in the first place (the employer either signed the agreement or authorized an association to do so or is considered by law to have granted such authority). Indeed, by its terms Section 1145 applies only to an "employer who is *obligated* to make contributions" (emphasis added). And see *Sullivan v. Cox,* 78 F.3d 322, 324–25 (7th Cir.1996):

> ERISA essentially imposes a federal obligation on employers who contractually agree to contribute to employee pension plans.
>
> \*   \*   \*   \*   \*   \*
>
> Section 1145 only creates a federal ERISA obligation for employers who are obligated to make contributions even absent the statute—in other words, those who are obligated under state law.

7. Courts generally recognize only three defenses under Section 1145 (*Agathos v. Starlite Motel,* 977 F.2d 1500, 1505 (3d Cir.1992) (citations omitted)):

> (1) the pension contributions themselves are illegal, (2) the collective bargaining agreement is void *ab initio,* as where there is fraud in the execution, and not merely voidable, as in the case of fraudulent inducement, and (3) the employees have voted to decertify the union as its bargaining representative, thus prospectively voiding the union's collective bargaining agreement.

8. Moriarty's reading of Section 1145 would allow employers to be bound to CBAs by the actions—whether authorized or not—of anyone who purports to act on their behalf. That finds no warrant either in the case law or in common sense.

Thus the principles quoted from *Robbins* and *Gerber Truck* (and the like pronouncements and consequent rulings in other cases relied on by Moriarty) are not in point, because in each of those cases the employer had affirmatively agreed to bind itself to a CBA either by signing the agreement itself (*Gerber Truck,* 870 F.2d at 1150; see also two other cases cited by Moriarty, *Central States, S.E. and S.W. Areas Pension Fund v. Joe McClelland, Inc.,* 23 F.3d 1256, 1257–58 (7th Cir.1994) and *Laborers' Pension Fund v. Concrete Structures of the Midwest, Inc.,* 999 F.2d 1209, 1210 (7th Cir.1993)) or by clearly manifesting an intent to be bound by such an agreement (*Robbins,* 836 F.2d at 332). In such situations courts do not of course allow an employer to assert understandings or defenses that might be applicable to the original parties to defeat a pension or welfare fund's claim on an otherwise valid commitment (see *Gerber Truck,* 870 F.2d at 1149, and numerous cases cited *id.* n. 1).[7]

But here the crucial question is the more fundamental (and different) one of whether there is *any* basis for obligating the employer in the first place (see *Wenzel v. Jeff Parking Corp.,* Nos. 93 Civ. 5071 (AJP) and 94 Civ. 0831 (AJP), 1995 WL 258055, at *4 (S.D.N.Y. May 3)).[8] And because Glueckert admittedly did not itself enter into any agreement with Union or Funds, the only way that it can be obligated to Funds is if FDSA had the authority—either actual or apparent—to bind Glueckert to such an obligation.[9]

9. LMRA's related provisions (Sections 186(a) and (c)(5)(B))—providing that it is "unlawful for any employer" to pay or agree to pay money to a "representative of any of his employees" or to a "labor organization," except when such money is paid to a trust fund where the basis on which such payments are to be made is specified in a "written agreement with the employer"—merit little discussion. Even Glueckert acknowledges (correctly) that its own failure to execute such an agreement does not preclude it from being bound by an agreement entered into on its behalf by a duly authorized agent. Because the dispositive issue here is the existence or nonexistence of such authority on FDSA's part, there is really no need to explore the "written agreement" requirement. If FDSA had authority to act as Glueckert's agent, the "written agreement" requirement is undisputably satisfied by the CBAs between FDSA and Union. And if

■ So the controlling legal issue here lies in the familiar territory of agency law: Any employer is bound by an agreement entered into by a multiemployer association if the association had actual or apparent authority to enter into the agreement on that employer's behalf (*Trustees of the UIU Health and Welfare Fund v. New York Flame Proofing Co.*, 828 F.2d 79, 82–84 (2d Cir.1987)); *Crane Sheet Metal, Inc. v. NLRB*, 675 F.2d 256, 258–59 (10th Cir.1982); *Bevona v. Deer Head Chem. Indus., Inc.*, No. 90 Civ. 3973 (RJW), 1991 WL 146327, at *3 (S.D.N.Y. July 19); *Shearon Envtl. Design Co., Inc. v. Laborers' Dist. Council*, No. Civ.A. 93–1317, 1993 WL 476232, at *5 (E.D.Pa. Nov. 18). In the usual case the question posed here never arises, for employers most often expressly authorize an association to negotiate on their behalf (see, e.g., *International Union of Operating Eng'rs, Local 150 v. G. Bliudzius Contractors, Inc.*, 730 F.2d 1093, 1096–97 (7th Cir. 1984) (per curiam)). But here (for reasons that will be seen) it cannot be decided as a matter of law whether FDSA was or was not authorized to enter into agreements with Union on Glueckert's behalf so as to obligate Glueckert to make contributions to Funds.

As familiar as the operative standards of agency law may be (or at least as familiar as they were when agency was a valuable—in some ways the most valuable—course in the law schools' mandatory curriculum), it is worth a few moments to place those standards in the special matrix of employers and employer associations. That is particularly true given the parties' limited attention to the alternative of apparent authority (perhaps that inattention is less surprising on Glueckert's part than on Funds', which clearly have a difficult row to hoe in establishing

actual authority). This opinion turns to the subject of agency in the employer-employer association context, then, before applying the relevant standards to this case.

■ For an employer to be found to have granted a multiemployer association *actual* authority, it must have performed an act evidencing an "unequivocal intention to be bound" (*New York Flame Proofing*, 828 F.2d at 82–83; *Wenzel*, 1995 WL 258055, at *4–*5)).[10] Although that often takes the form of an express delegation of authority, the requisite intent can also be inferred from acts that evidence such an intent—see, e.g., *Robbins*, 836 F.2d at 332 (intent is to be discerned from "visible indicators," so that "[p]rivate intent is irrelevant") and *Restatement (Second) of Agency ("Restatement")* § 26 (1958), which teaches that authority can be created by "conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account," and *id.* cmt. a, which says that "the manifestation and not the intention of the principal is important."[11] So while "[m]ere membership in an employers' association, without more, does not necessarily evidence an unequivocal intention to be bound by the collective agreements it negotiates" (*New York Flame Proofing*, 828 F.2d at 83 (citation omitted)), the same decision goes on immediately to explain (*id.*):

> However, if the "principal, if not virtually sole activity" of an association is to negotiate collective bargaining agreements on behalf of its members and if the longstanding, universally observed and universally known custom is that members are bound by such agreements, acquiring membership in that organization does constitute an

---

FDSA did not have such authority, Glueckert is simply not obligated to Funds (see *Wenzel*, 1995 WL 258055, at *4–*5).

**10.** Several of the cases in this area of the law accord an almost talismanic significance to the "unequivocal intention to be bound" language (see, e.g., *ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc.*, No. 84 Civ. 3673 (BN) (GLG), 1987 WL 16149, at *7 (S.D.N.Y. Aug. 21), *rev'd on other grounds*, 846 F.2d 879 (2d Cir.1988)). Such emphasis obscures the point (extremely significant in this case) that "[t]he 'unequivocal intention' test does not render other rules of the

law of agency, and in particular the doctrine of apparent authority, inapplicable" (*New York Flame Proofing*, 828 F.2d at 83).

**11.** Thus the "intent" requirement should not be taken too literally. While Glueckert has produced facts from which it can be inferred that John Sr. (and hence Glueckert) had no desire or *subjective* intent to be bound by any CBAs entered into between FDSA and Union, that does not necessarily foreclose a finding that Glueckert's actions were sufficient to evidence a delegation of authority.

unequivocal statement as to its actual authority to bind the new member.

And see *Restatement* § 26 cmts. b-e.

Although as already indicated the parties did not address this further alternative in any detail, Glueckert can also be obligated to Funds if it clothed FDSA with *apparent* authority to act on its behalf. That doctrine would apply if Union reasonably believed that Glueckert had delegated authority to FDSA to enter into agreements on its behalf (*New York Flame Proofing*, 828 F.2d at 83–84; *Shearon Envtl.*, 1993 WL 476232 at *5)). As *Restatement* § 27 puts it:

> [A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

"Of course, the acts that create the appearance of actual authority must be acts of the principal [Glueckert], not those of the agent [FDSA]" (*New York Flame Proofing*, 828 F.2d at 84), so that FDSA "cannot confer apparent authority on itself; the authority of an agent can only be established by tracing it to its source in some word or act of the alleged principal" (*id.* (citations and internal quotation omitted)). Particularly applicable to this case is *Restatement* § 49 cmt. c:

> Acts are interpreted in the light of ordinary human experience. If a principal puts an agent into, or knowingly permits him to occupy, a position in which according to the ordinary habits of persons in the locality, trade or profession, it is usual for such agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority, in the absence of reason to know otherwise. The content of such apparent authority is a matter to be determined from the facts.

*Accord, id.* § 27 cmt. a; *Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 463 (7th Cir.1994).

*Application of the Legal Principles*

■ Under the confluence of summary judgment principles and agency law, Moriarty can prevail on his motion only if, with Glueckert given the benefit of the reasonable favorable inferences mandated by Rule 56, the record shows that as a matter of law—i.e., that no reasonable factfinder could conclude otherwise—FDSA acted with actual or apparent authority to enter into agreements with Union on Glueckert's behalf. Conversely, Glueckert can win now only if, with Moriarty given that same Rule 56 generosity, the record shows that as a matter of law FDSA did not have actual or apparent authority. What follows are some of the principal facts that support each party's motion, from which it becomes apparent that this Court cannot decide as a matter of law whether or not FDSA had authority to act on Glueckert's behalf.

In the light most favorable to Moriarty:

1. FDSA bargains with Union on behalf of all of its employer-members, including Glueckert. It has always advised Union at the outset of negotiations for a new CBA that it is bargaining on behalf of all of its members, and its labor contracts with Union purport to bind all FDSA members that employ persons who perform covered work. In addition, a principal activity of FDSA is and always has been the negotiation of labor contracts with Union, and it is a universally observed custom that all FDSA employer-members are bound by those contracts (P. 12(M) ¶ 10; P. 12(N) Supp. ¶¶ 61–64; Moriarty Dep. 120–21, 139).

2. As a member of FDSA for six years, Glueckert periodically (several times during the course of each year) received FDSA newsletters (P.Ex. X; P. 12(M) ¶ 12, 26) that made reference to, and provided updates on the status of, labor negotiations that the FDSA's negotiating teams were involved in on behalf of FDSA members (see P.R.Mem. 8–9 for relevant excerpts from those newsletters).

3. As a member of FDSA, Glueckert periodically received notice from FDSA that labor contracts were open for negotiation. And after the negotiation of new

labor contracts, Glueckert was sent notice of the new terms of those contracts and copies of the contracts (D. 12(N) ¶ 12.2–.3; Moriarty Aff. ¶¶ 14–16, 21–22). Some FDSA letters sent to its members, including Glueckert, that informed them of new CBAs stated that the agreements apply "to every member of the association" (P.Ex. Z; Moriarty Aff. ¶ 22).

4. Both John Jr. (and to a lesser extent John Sr.) participated in FDSA activities and periodically attended FDSA membership meetings, at which meetings the minutes of the most recent FDSA Board of Directors (the "Board") were read (P.Ex. AA 9–12). And John Jr. actually served on the Board, which is entrusted to manage FDSA, from March 1994 until September 1994, during which time the Board approved the embalmers negotiating committee's proposed labor contract (P.Ex. AA 10–11; see P.R.Mem. 5–6).[12]

But viewed in the light most favorable, to Glueckert:

1. Labor negotiations are not as large or conspicuous a part of FDSA as Moriarty suggests. In fact, when John Sr. was considering joining FDSA he was sent a letter from FDSA providing background and introductory information on the association (P.Ex. W; D.Ex. 4A). That letter outlines recent FDSA activities and areas of interest such as "Funeral Director Regulation," "Insurance Programs" and "Fu-neral Director and Consumer Education," but it does not so much as mention negotiation of labor contracts with Union (id.). FDSA also sent John Sr. a one-page brochure titled "WHAT FDSA CAN DO FOR YOU" (D.Ex. 4A). Despite listing several different services that FDSA has to offer to potential members (including "Information Central," "Educational Meetings and Workshops," "Government Relations," "Insurance Programs," "Programming Assistance," "Special Reports," "Legal," "Legislative," "Monthly Newsletter," "Quarterly Meetings," "Other Services," "Fun" and "Travel"), that promotional document makes no reference to labor relations or to the negotiation of labor contracts with Union (id.).

2. Before joining FDSA, John Jr. and Sr. met with FDSA Executive Director Moriarty to discuss Glueckert's joining FDSA. At that meeting, John Sr. asked Moriarty a question about FDSA and union membership (John Sr. Dep. 47). John Sr. says that he understood Moriarty's response to mean that joining FDSA would not create any relationship between Glueckert and any union (John Sr. Aff. ¶ 8).[13]

3. Although Glueckert may have known that FDSA bargained on behalf of some of its members, it was not aware that FDSA bargained on behalf of *all* of its members and was not aware of any labor or union

---

12. Glueckert has been quick to point out that John Jr. did not attend the July 1, 1994 Board meeting when that labor contract was approved. While that may be true (minutes of that meeting (P.Ex. BB 311) reflect that he was absent), the agency principles discussed in this opinion indicate that John Jr.'s general Board involvement may nonetheless be relevant. In addition, Board minutes reflect that John Jr. *was* present at a July 20, 1994 Board meeting at which labor negotiations were discussed (P.Exs. BB 313–14).

13. While this Court is obligated to grant Glueckert the benefit of all reasonable favorable inferences, there is of course no corresponding obligation to credit "efforts to patch up a party's deposition with his own subsequent affidavit" (*Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir.1995)). On that score, Glueckert characterizes that conversation as follows (D. 12(N) ¶¶ 17–18):

> During the discussion, Glueckert, Sr. specifically asked Moriarty if Glueckert's member-ship in the FDSA would create any relationship between Glueckert and any union.... Moriarty expressly stated that membership in the FDSA would not create a relationship between Glueckert and a union.

Although such a version does appear in John Sr. Aff. ¶ 8, the actual underlying facts do not match that characterization: John Sr. Dep. 46–47 shows that Glueckert asked, "by ... being a member of [FDSA] would I have to be a member of the union" and Moriarty answered, "no" (John Jr. Dep. 37 gives a different characterization of the exchange, but his father is the one who reports the conversation directly). While it may be up to a factfinder to determine whether John Sr.'s interpretation of that response was reasonable, this Court does not have to accept the version contained in John Sr.'s self-serving affidavit. And as stated a bit later, Moriarty does not quarrel with John Sr.'s account of their exchange, but he attributes a totally different meaning to what was said.

ramifications to joining FDSA, and it was never informed by anyone (until 1994) that by joining FDSA it would be obligated to make contributions to Funds (D. 12(M) 29–30, 37, 41, 47, 50–52; Glueckert Sr. Aff. ¶ 10; see D.R.Mem. 5, 7–9). Glueckert never signed a CBA or any document authorizing FDSA to negotiate such agreements on its behalf, and it has never voted upon, approved or ratified any union contract (D. 12(M) ¶¶ 31–36). Glueckert has also provided the affidavit of one other FDSA member who was not aware that FDSA bargained on its behalf (Justen Aff.).

In terms of "the actions of the principal" that may create an agency relationship, the undisputed factual background shows that once having joined FDSA, Glueckert remained a member for several years, received FDSA correspondence, attended meetings and had its manager appointed to FDSA's Board—all the while being told on a regular basis (several times yearly) about FDSA's negotiation of CBAs with Union, about the details of wages and working conditions involved in those negotiations and about the results of those negotiations (including being sent copies of the CBAs themselves). To recapitulate the earlier summary of legal principles, such actions may well contribute to the finding of a grant of authority to FDSA, but they cannot alone be held to prove such a grant unless they were sufficient either (1) to manifest an intention to be bound that would support a reasonable belief on *FDSA's* part that it had authority to bind Glueckert (actual authority) or (2) to support a reasonable belief on *Union's* part that FDSA was authorized to bind Glueckert (apparent authority).

In terms of the pro-Glueckert factors, when buttressed with favorable inferences, Moriarty must fail at this stage in its conten- tion (see P.Mem. 6–7, 10, 13; P.R.Mem. 7–8; P. 12(N) ¶ 31) that as a matter of law Glueckert's agreement to join FDSA amounted to an express delegation of authority to bind it to CBAs with Union. While it is true that in becoming an FDSA member Glueckert agreed to "be bound by [FDSA's] Constitution, By–Laws, Rules and Regulations" (P.Ex. N), the FDSA Constitution and By–Laws—both those in effect when Glueckert joined FDSA (P.Ex. S) and those now in effect (P.Ex. T)—not only lack specific authorization to FDSA to conduct collective bargaining on behalf of its membership, but they do not even mention the subject (just as the introductory letter and brochure also did not mention such activity).

Instead, FDSA's authorization to conduct labor negotiations on behalf of its membership is contained in FDSA's "Official Statements of Policy" ("Policy Statements") [14]—a document that, although available to any FDSA member, is not ordinarily given to or discussed with new members (Moriarty Dep. 112) and that was not given to Glueckert when it joined (P. 12(M) ¶ 28).[15] That, when coupled with John Sr.'s understanding of his initial conversation with Moriarty, is enough to allow Glueckert to escape summary judgment on the issue of whether it, by signing the FDSA application and membership card (with their agreement to be bound by FDSA's Constitution, By–Laws, Rules and Regulations), must be found as a matter of law to have conferred bargaining authority upon FDSA, rather than leaving it to the factfinder to resolve the fact-sensitive agency determination.

What has just been said should not be overstated, however. On the other side of the coin, a reasonable factfinder could well conclude—especially if Moriarty's explanation of John Sr.'s question and his own answer were accepted [16]—that Glueckert's es-

---

**14.** That paragraph of the Policy Statements reads (P.Ex. U at 174; P.Ex. V at 181):

> The Board of Directors shall authorize the President of the Association to appoint a committee representing the membership of the Association in labor negotiations and enter into such agreements as are a result of such negotiations, subject to the approval of the Association membership.

**15.** John Jr. did receive a copy of the Policy Statements (contained in the FDSA Board Handbook) when he joined FDSA's Board (P.Ex. AA 8–9).

**16.** Here is what Moriarty says (his Supp.Aff. ¶¶ 4–5):

> 4. I do not recall the specific details of all subjects discussed with John Glueckert, Sr.

sentially ostrich-like behavior was entirely unjustified.[17]

So this Court must now deny both parties' motions because the question whether FDSA had authority—actual or apparent—to act as Glueckert's bargaining agent really hinges on the facts (see *Anetsberger v. Metropolitan Life Ins. Co.,* 14 F.3d 1226, 1234 (7th Cir. 1994), quoting Illinois case law holding that "[t]he existence and scope of an agency relationship are questions of fact, unless the parties' relationship is so clear as to be undisputed"). And on the present record it cannot be determined as a matter of law that FDSA either was (Moriarty's motion) or was not (Glueckert's motion) authorized to enter into CBAs on Glueckert's behalf—most prominently due to the need for a factual determination in terms of the conspicuousness and scope of FDSA's collective bargaining activities.

### Affirmative Defenses

■ Although Glueckert has also raised laches and estoppel defenses, neither party has sufficiently addressed the applicability of those defenses to a fund's collection action against an employer[18]—certainly Glueckert's citations (D.R.Mem. 13–14) to cases such as *Central States Fund v. Blue Ridge Trucking Co.,* No. 91 C 824, 1993 WL 303128, at *1–*2 (N.D.Ill. Aug. 9) are unhelpful. But even if such defenses are assumed to be potentially applicable to such an action (see *Iron Workers' Local No. 25 Pension Fund v. Klassic Services, Inc.,* 913 F.Supp. 541, 544–46

(E.D.Mich.1996) and cases cited there; *Central States Fund v. Heineman Distrib., Inc.,* No. 93 C 1246, 1994 WL 496730, at *3 (N.D.Ill. Sept. 9)), Glueckert has not established its entitlement to either defense as a matter of law (see *Hawxhurst v. Pettibone Corp.,* 40 F.3d 175, 181 n. 5 (7th Cir.1994) ("Laches is an affirmative defense which is required to be proved by the party raising it")).

■ Two elements must be present to establish laches: (1) unreasonable delay in the assertion of a right and (2) resulting prejudice to the opposing party (*id.* at 181; *Zelazny v. Lyng,* 853 F.2d 540, 541 (7th Cir.1988)). As to the first factor, Glueckert points to the fact that Funds did not seek any contributions until five years after Glueckert joined FDSA, and as to the second component Glueckert says that it "spent tens of thousands of dollars on health, welfare and pension benefits for its employees" and "would not have done so if it had believed its employees were already covered by a fund or funds" (D.R.Mem. 14). But Glueckert has not established its entitlement to summary judgment as to either element:

1. As for the delay factor, Glueckert simply has not shown that Fund's actions were *unreasonable* as a matter of law—Glueckert's bare assertions that Funds displayed a "lack of diligence" notwithstanding.[19]

2. As for any notion of prejudice, Funds dispute that component by contend-

---

and John Glueckert, Jr. prior to Glueckert joining the FDSA. But, I never told any employer, or anyone, ever, that joining the FDSA would not bind an FDSA employer-member to the collective bargaining agreements between the FDSA and the Union.

5. Occasionally, when asked, I would inform individual proprietors operating FDSA members or prospective sole proprietors that they, themselves, do not individually have to be Union members because they are the owners of FDSA employer-member businesses. This has no bearing on employees who do not own funeral homes or businesses and who perform bargaining unit work.

**17.** On that score the principles discussed in *Restatement* § 43 cmt. c may well doom Glueckert:

In the absence of other evidence as to the agent's authority, the fact that the principal

acquiesces in the conduct of the agent is sufficient evidence to prove authorization or ratification. If such conduct of the agent is known to a third person, as the principal has reason to know, and the principal makes no manifestation of his objection thereto, although he could easily do so, apparent authority is thereby created.

See also *id.* §§ 43(1) and 94.

**18.** In fact, Moriarty devotes only a short paragraph at P.Mem. 14 to a consideration of the two defenses, while Glueckert does not address them at all in its opening memorandum but does so in its final filing (D.R.Mem. 13–15).

**19.** Funds have proffered evidence describing their billing procedures and explaining why Funds did not seek collection from Glueckert until late 1994 (P. 12(M) ¶¶ 15–18).

ing that the amounts spent by Glueckert "were paid at rates much lower than the amounts required by the Funds" (P.R.Mem. 15).

Estoppel analysis does not add anything new or different to the mix, for in the context of this case laches is clearly the more appropriate and accurate way of characterizing any equitable defense to which Glueckert may arguably be entitled (see *Martin v. Consultants & Adm'rs, Inc.,* 966 F.2d 1078, 1091 (7th Cir.1992) ("[l]aches is a species of estoppel")). After all, the only action on Funds' part that could form the basis of an estoppel defense consists of the same inaction that supports any potential defense of laches—Funds' failure to seek collection for several years.[20] And both the claimed prejudice identified by Glueckert and Funds' response to that claim equate to a dispute over the detrimental reliance factor of an estoppel defense. Thus it is difficult to imagine the facts of this case spinning out in such a way that Funds' actions would entitle Glueckert to an estoppel defense but *not* to a laches defense.

### Conclusion

Because neither party has met its burden of establishing the lack of a genuine issue of material fact, neither is entitled to a judgment as a matter of law. Both Rule 56 motions for summary judgment are denied. This action is set for a status hearing at 9 a.m. June 13, 1996 to discuss (1) any further procedures required to ready the case for trial and (2) the setting of a trial date.[21]

---

**20.** To the extent that Glueckert also relies on "Moriarty's assurance that by joining the FDSA, Glueckert would not incur any Union obligations" (D.R.Mem. 14) as the basis for an estoppel defense, Glueckert is faced with two major hurdles. First, Moriarty disputes that version of their conversation (Moriarty Supp.Aff. ¶¶ 4–5). Second, for an estoppel to operate against Funds any such representation must have been an authorized communication by them or on their behalf—and there is no evidence that if Moriarty

was really telling John Sr. what the latter now claims, (1) Moriarty was speaking on Funds' behalf in that respect or (2) if he was, he was authorized to do so.

**21.** Both of those things assume that given the all-or-nothing risks that are posed by this case in light of what has been said here, either or both parties wish to roll the dice at trial rather than settling.