Thomas J. MORIARTY, Trustee on behalf of the Trustees of the Local Union No. 727, I.B.T. Pension Trust, and the Trustees of the Teamsters Local Union No. 727 Health and Welfare Trust, Plaintiff,

v.

MODELL FUNERAL HOME, LTD., an Illinois corporation, Defendant.

No. 95 C 331.

United States District Court,
N.D. Illinois,
Eastern Division.

March 27, 1997.

Joseph M. Burns, Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for plaintiff.

Michael P. Connelly, Thomas F. Tobin, Connelly & Schroeder, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Thomas J. Moriarty, suing as trustee on behalf of the trustees of the Local Union No. 727, I.B.T. Pension Trust, and the trustees of the Teamsters Local Union No. 727 Health

and Welfare Trust ("Funds"), sued Modell Funeral Home, Ltd. pursuant to the Employee Retirement Income Security Act ("ERISA") section 502(a)(3), 29 U.S.C. § 1132(a)(3), and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for employer contributions said to be due under two employee benefit plans maintained by the trustees. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1337 and 29 U.S.C. §§ 185(c) and 1132(e)(1). Trial was held following discovery. This opinion constitutes my findings of fact and conclusions of law.[1]

### Findings of Fact

1. Thomas J. Moriarty is a trustee and fiduciary of both Funds. Until the end of 1993, he was also the Executive Director of the Funeral Directors Services Association of Greater Chicago ("FDSA"), an association of funeral directors. Among other activities, the FDSA purports to act on behalf of its employer members in negotiating collective bargaining agreements with the Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, I.B.T. ("Union").

2. Mr. Moriarty claims that the principal function of the FDSA is the negotiation of collective bargaining agreements covering chauffeur, embalming and funeral directing employees. The evidence does not support this claim. The FDSA Constitution does not mention the negotiation of collective bargaining agreements. Letters sent to prospective FDSA members do not mention this activity.

3. An example of the FDSA's own characterization of its activities is contained in a November, 1994 FDSA newsletter (the newsletter is published monthly) in which 20 services offered by the FDSA are listed. I have reproduced the list here because it gives a picture (presumably accurate) of the FDSA's range of activities:

---

1. If any finding of fact includes a conclusion of law or vice versa it shall be deemed such to the extent appropriate.

1. A Pre–Arranged Funeral Fund of some $20 million which currently has a yield to maturity of 6.6%.

2. An excellent, competitive insurance program for funeral home vehicles.

3. A funeral home and professional liability insurance plan at premiums that are hard to beat.

4. Ongoing liaison with governmental agencies at all levels; federal, state, county and city.

5. Compliance information regarding OSHA, FTC, ADA, EPA and other mandates at all levels of government.

6. Legislative input on laws affecting funeral service at the federal, state and local levels.

7. Research projects with various institutions and related professionals.

8. Continuing education programs of high quality on various interesting and informative topics.

9. Annual Reference Guide and Diary— an outstanding reference source for funeral service professionals.

10. Monthly NEWSLETTER to keep up to date on current information.

11. Subscription service to NEWSLETTER and other bulletins.

12. Resource information as close as your telephone.

13. Incident Reporting Form for reporting current problems with an eye to problem solving.

14. Sample forms for your convenience and assistance.

15. Library of books, periodicals, filmstrips and video tapes for informational purposes.

16. Credit card program to permit families to charge funeral expenses, thereby assuring prompt payment at a minimal collection cost.

17. Meetings (with refreshments) to keep you informed of recent developments and to make you aware of problems and solutions.

18. Social events including an annual Golf Tournament, Dinner and a Seminar–Tour to mix business and pleasure.

19. Assistance with licensing and filing requirements of the Illinois Comptroller's Office, including fidelity bond requirements.

20. Networking with other funeral service related associations.

(Def.'s Exh. 7 at 3–4.) Notably, collective bargaining is not included in the list.

4. The annual report of the outgoing FDSA president dated November 16, 1993 (Def.'s Exh. 3) similarly provides evidence contrary to Mr. Moriarty's contention. The report discusses the various activities of the FDSA for the prior year, which included a search for a new executive director, 70 continuing education programs held during the year, lobbying efforts with respect to Illinois law, a seminar-tour, a golf outing, new standard forms covering cremation authorization and rental caskets, and meetings with the Chicago Department of Health and with a hospital over various issues. The report does not mention collective bargaining. The committee reports for the 1993 annual meeting also cover many activities, but do not mention collective bargaining.[2]

5. From before the time Modell joined the FDSA and throughout the relevant period, the FDSA and the Union had ratified various collective bargaining agreements. The agreements state that they are applicable to all FDSA members. They require each member to make contributions to the Funds for employees performing covered work.

6. Modell joined the FDSA in 1979 following discussions with Mr. Moriarty. During those discussions, Modell's principals were not told that by joining the FDSA Modell would become obligated either to make contributions to the Funds on behalf of Modell's employees (Modell had no non-family employees at the time) or that by joining

2. It is possible that the information from 1993 is atypical. However, Mr. Moriarty did not introduce evidence from other years.

the FDSA Modell was giving the FDSA authority to bargain on its behalf. Although Modell subsequently opened additional funeral establishments (it eventually had three operations, all known to the FDSA) and employed persons who would be covered by FDSA collective bargaining agreements, Modell did not pay contributions on behalf of these employees. Neither did Modell receive any direct communication from anyone until late 1994 that it owed contributions to the Funds.

7. Although Modell was not told when it joined the FDSA that it would be liable for contributions to the Funds and although collective bargaining was not the principal activity of the FDSA, Modell learned, or should have learned, over the years that the FDSA believed it represented Modell in collective bargaining agreements between the FDSA and the Union. At least some of the times when the contracts in question came up for renewal, employer members, including Modell, were sent letters inviting them to meetings to discuss the negotiations. Furthermore, copies of the new contracts were sent to each employer, including Modell. Letters accompanying the contracts as well as statements in newsletters explicitly stated that the agreements were binding on all members and that they covered all employees performing covered work. There were other references in newsletters, primarily to dates, such as Christmas and New Year's, when, according to the newsletter reminders, under the collective bargaining agreements funerals could not be held.

8. Modell relies on evidence that it had its own pension plan and that it provided health insurance to its employees as proof that it did not know that it was required to contribute to the Funds.[3] This evidence supports Modell's contention that it did not intend to be bound by the FDSA negotiated collective bargaining agreements. In addition, Modell never voted on any union contract nor signed any document authorizing the FDSA to negotiate on its behalf.

### Conclusions of Law

1. Modell is an employer within the meaning of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 152(2), and ERISA, 29 U.S.C. § 1002(5). The FDSA is an employer within the meaning of the LMRA, 29 U.S.C. § 152(2). The Funds are employee benefit plans within the meaning of ERISA, 29 U.S.C. § 1002(3). Thomas J. Moriarty, as trustee of the Funds, is authorized to enforce the obligations imposed by ERISA upon employers. 29 U.S.C. § 1132(a)(3). The Union is a labor organization representing employees in an industry affecting commerce within the meaning of the LMRA, 29 U.S.C. §§ 152(5) and 185.

■ 2. The Funds are third-party beneficiaries of collective bargaining agreements between the FDSA and the Union. *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1151 (7th Cir.1989); *Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir.1988). Under ERISA, every employer obligated pursuant to the terms of an employer "plan" or a collective bargaining agreement to make contributions to a Fund, must, unless inconsistent with law, make such contributions. 29 U.S.C. § 1145.

■ 3. Modell is obligated to make contributions to the Funds only if it agreed to do so. Modell is obligated to make contributions if it gave the FDSA authority to enter into agreements on its behalf. *E.g., Moriarty v. Glueckert Funeral Home, Ltd.*, 925 F.Supp. 1389, 1393 (N.D.Ill.1996) (J. Shadur). That authority may be actual or apparent. *Id.; Trustees of the UIU Health and Welfare Fund v. New York Flame Proofing Co.*, 828 F.2d 79, 82–84 (2d Cir. 1987).

■ 4. Modell could be found to have given the FDSA actual authority to bind it to

---

**3.** Modell also presented evidence that other funeral homes in the Chicago area did not make contributions to the Funds. (Mr. Moriarty has begun collection proceedings against each of those operators.) Certain of these employer FDSA members testified in the trial of this case, over the objection of Mr. Moriarty. The fact that they did not make contributions and, like Modell, did not receive any direct notice until 1994 or later that they owed contributions lends some corroboration to Modell's argument that the obligation was not universally observed.

collective bargaining agreements, and thus the duty to make contributions to the Funds, either by giving the FDSA express authority or by doing some act indicating an "unequivocal intention to be bound." *New York Flame Proofing*, 828 F.2d at 82–83; *Glueckert Funeral Home*, 925 F.Supp. at 1393. In this case, Modell did not give the FDSA express authority to bind it to the collective bargaining agreements.

 5. Neither did Modell indicate an "unequivocal intention to be bound" by the FDSA negotiated agreements. *New York Flame Proofing* held that such an intention could be drawn from membership in an association whose " 'principal, if not virtually sole activity' was to negotiate collective bargaining agreements on behalf of its members" where the "longstanding, universally observed and universally known custom is that members are bound by such agreements." 828 F.2d at 83. In this case I have found that the FDSA's principal activity has not been shown to be negotiating collective bargaining agreements. Neither has Mr. Moriarty shown that the FDSA's members have universally observed any custom to be bound by such agreements. I conclude that Modell did not give the FDSA actual authority to bind it to make contributions to the Funds.

 6. As Judge Shadur found in *Glueckert*, however, this does not end the inquiry. Modell can still be found obligated to make contributions if it gave the FDSA apparent authority to bind it. *Glueckert*, 925 F.Supp. at 1394.

> [A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

RESTATEMENT (SECOND) OF AGENCY ("RESTATEMENT") § 27 (1958); *Glueckert*, 925 F.Supp. at 1394. The acts of the principal mean the acts of Modell. *Id.* If Modell put

its agent (the FDSA) in a position "in which according to the ordinary habits of persons in the locality, trade or profession, it is usual for such agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority. . . ." RESTATEMENT, § 27 cmt. a; *Glueckert*, 925 F.Supp. at 1394.

7. Although Modell did not know at the time it joined the FDSA that the FDSA expected to act as its agent in negotiating collective bargaining agreements, Modell subsequently was informed on repeated occasions over the years, through letters and newsletter reports, that the FDSA believed it was acting on Modell's behalf—and purported to bind all FDSA members, including Modell—each time it negotiated an agreement with the Union. At no time did Modell protest that it had given no authority, or even make an inquiry. I conclude that Modell's inaction reasonably supports the Union's belief that the FDSA was authorized to bind Modell to the collective bargaining agreements negotiated over the years. See RESTATEMENT § 43 cmt. c:

> In the absence of other evidence as to the agent's authority, the fact that the principal acquiesces in the conduct of the agent is sufficient evidence to prove authorization or ratification. If such conduct of the agent is known to a third person, as the principal has reason to know, and the principal makes no manifestation of his objection thereto, although he could easily do so, apparent authority is thereby created.

*Accord, Glueckert*, 925 F.Supp. at 1397 n. 17. Modell therefore gave the FDSA apparent authority to act on its behalf.[4]

8. I conclude that Modell is liable to the Funds for contributions on behalf of its employees during the relevant contractual period. Within 30 days, Modell shall produce all pertinent books and records deemed necessary by the Funds for an audit to determine

---

4. In its answer Modell raised the affirmative defenses of laches and estoppel. It did not pursue these defenses either in its proposed findings of fact and conclusions of law nor in final argu-

ment. I need not decide therefore whether the evidence or current law in this Circuit would support these defenses.

the amount owed. Status is set for June 26, 1996 at 8:45 a.m.